FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MAY 16, 2024

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MAY 16, 2024

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 20439-0 |
| Respondent, | ) | |
| | ) | En Banc |
| v. | ) | |
| JIM WALLAHEE, | ) | Filed: <u>May 16, 2024</u> |
| Appellant, | ) | |
| ESTATE OF CLYDE WALLAHEE, | ) | |
| Intervenor. | ) | |

GONZÁLEZ, C.J. — More than a century ago, the United States government signed treaties with many of the tribal nations living in what would become Washington State. The treaty between the United States and the Confederated Tribes and Bands of the Yakama Nation explicitly enumerates many rights reserved by the Yakama people, including the right to fish in their usual and accustomed places and to hunt on open and unclaimed lands. Nevertheless, in 1924, Jim Wallahee, a Yakama citizen, was convicted of illegal hunting when he killed a deer on ceded Yakama land. Relying on precedent that has since been

overturned, this court affirmed his conviction. Today we reject the harmful logic that underpins his wrongful conviction and recognize that Mr. Wallahee had a clear and enforceable treaty right to hunt that deer. Accordingly, we withdraw our previous mandate and vacate Mr. Wallahee's conviction.

## BACKGROUND

As Europeans began to settle in North America, the fledgling United States government relied on the "Doctrine of Discovery"[1] to establish a legal framework

---

[1] The term "Doctrine of Discovery" refers to doctrines articulated in a series of 15th century Papal Bulls and their subsequent codification in law. Collectively, these decrees purported to provide divine authorization for colonial powers to seize lands and asserted that any land not inhabited by Christians was "give[n], grant[ed], and assign[ed] forever" to the discoverer. POPE ALEXANDER VI, INTER CAETERA (1493), *reprinted and translated in* 1 EUROPEAN TREATIES BEARING ON THE HISTORY OF THE UNITED STATES AND ITS DEPENDENCIES 56, 62 (Frances Gardiner Davenport & Charles Oscar Paullin eds., 1917). The decrees further directed that "barbarous nations be overthrown and brought to the faith itself," and they blessed Christians to "invade, search out, capture, vanquish, and subdue all Saracens and pagans whatsoever . . . and to reduce their persons to perpetual slavery." *Id.* at 61; POPE NICHOLAS V, ROMANUS PONTIFEX (1455), *reprinted and translated in* 1 EUROPEAN TREATIES, *supra*, at 9, 23; *see also* POPE NICHOLAS, DUM DIVERSAS (1452), *translated in* UNUM SANCTUM CATHOLICAM, http://unamsanctamcatholicam.blogspot.com/2011/02/dum-diversas-english-translation.html [https://perma.cc/U28M-C8RZ].

In 1823, the United States Supreme Court enshrined this principle in American common law. Writing for a unanimous court, Chief Justice John Marshall asserted that "[c]onquest gives a title which the Courts of the conqueror cannot deny" and that discovery was sufficient for these purposes:

> However extravagant the pretension of converting the discovery of an inhabited country into conquest may appear; if the principle has been asserted in the first instance, and afterwards sustained; if a country has been acquired and held under it; if the property of a great mass of the community originates in it, it becomes the law of the land, and cannot be questioned. So, too, with respect to the concomitant principle, that the Indian inhabitants are to be considered merely as occupants . . . incapable of transferring the absolute title to others.

for granting land title to the European discoverer. A unanimous United States Supreme Court asserted the "exclusive right of the discoverer to appropriate the lands occupied by the Indians"; consequently, Native Americans retained only a right of occupancy, not ownership, to the lands they had stewarded from time immemorial. *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 584, 5 L. Ed. 681 (1823). *Johnson* provided the legal justification for Territorial Governor Isaac Stevens to pursue the treaties with Native people needed to formally open the Washington Territory to white settlement. Robert J. Miller, *American Indians, the Doctrine of Discovery, and Manifest Destiny,* 11 WYO. L. REV. 329, 346-47

---

*Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 588, 591, 5 L. Ed. 681 (1823).

In the face of indigenous activism from the Coalition to Dismantle the Doctrine of Discovery, Canadian First Nations activists, and many others, Pope Francis repudiated the Doctrine of Discovery in 2023. In a written statement, the Holy See "acknowledg[ed] that these papal bulls did not adequately reflect the equal dignity and rights of indigenous peoples" and "repudiat[ed] those concepts that fail to recognize the inherent human rights of indigenous peoples, including what has become known as the legal and political 'doctrine of discovery'." THE HOLY SEE PRESS OFF., JOINT STATEMENT OF THE DICASTERIES FOR CULTURE AND EDUCATION AND FOR PROMOTING INTEGRAL HUMAN DEVELOPMENT ON THE "DOCTRINE OF DISCOVERY" (Mar. 3, 2023), https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2023/03/30/230330b.html [https://perma.cc/X66P-8KE5].

The United States Supreme Court has not yet addressed this repudiation and has relied on authority that was based on *Johnson* as recently as 2005. *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 203 n.1, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005) (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 667, 94 S. Ct. 772, 39 L. Ed. 2d 73 (1974)).

(2011); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.03(6)(b) at 63-64 (Nell Jessup Newton ed., 2012).

In the treaty between the United States and the Yakama Nation of Indians, the Yakamas agreed to cede more than 10 million acres of land to the United States in exchange for certain promises. *See Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. ___, 139 S. Ct. 1000, 1016, 203 L. Ed. 2d 301 (2019) (Gorsuch, J., concurring in judgment). These promises included that the Yakamas would reserve a portion of land for their "exclusive use and benefit"; would retain the right to fish in their usual and accustomed places; and could hunt, gather, and pasture stock on open and unclaimed land. Treaty with the Yakamas, June 9, 1855, arts. II, III, 12 Stat. 951. This treaty, and others making similar promises made with other tribes in the area, paved the way for Washington State to exist.

These promises have not always been kept and the rights guaranteed in these treaties are not self-executing: they require the actions of tribes; tribal members; tribal, federal and state governments; and the judiciary to enforce and recognize them. The Yakama Nation, Yakama corporations, and individual tribal members have routinely taken Washington State to court to defend their treaty rights. *See, e.g.*, *United States v. Washington*, 520 F.2d 676 (9th Cir. 1975); *Cougar Den, Inc.*, 139 S. Ct. at 1021; *Tulee v. Washington*, 315 U.S. 681, 62 S. Ct. 862, 86 L. Ed.

1115 (1942). Jim Wallahee's conviction—which ignored a clear treaty right to hunt—was consistent with a pattern of disregard for the rights of Native people.

FACTS

Jim Wallahee, a citizen of the Yakama Nation, was charged with violating Washington's game laws in 1924. The facts are largely undisputed. Mr. Wallahee's attorneys and the Kittitas County prosecuting attorney agreed for purposes of the case that Mr. Wallahee was a tribal member, that he possessed the deer in question, and that he killed the deer while "hunting upon certain open and unclaimed lands" ceded to the United States by the Yakama Nation. Clerk's Papers (CP) at 7-8. They also stipulated that the treaty guaranteed the Yakamas "'the right of taking fish . . . together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.'" *Id.* at 8 (quoting Treaty with the Yakamas, *supra*, art. III).

Mr. Wallahee argued that he had a treaty right to hunt the deer. Unpersuaded that the State was obligated to honor the treaty, the trial court convicted him. This court compounded the error by affirming Mr. Wallahee's conviction based largely on precedent established in *Towessnute* and *Race Horse*, decisions that have since been overturned. *State v. Towessnute*, 89 Wash. 478, 154 P. 805 (1916), *judgment vacated and opinion repudiated by* 197 Wn.2d 574, 486 P.3d 111 (2020); *Ward v.*

5

*Race Horse*, 163 U.S. 504, 16 S. Ct. 1076, 41 L. Ed. 244 (1896) (repudiation recognized in *Herrera v. Wyoming*, 587 U.S. ___, 139 S. Ct. 1686, 1697, 203 L. Ed. 2d 846 (2019)). In deciding *Wallahee*, this court made a series of assertions that are both incorrect and harmful, including that "the Yak[a]ma Tribe was not an independent nation nor a sovereign," that the Yakama people were "mere occupants" of their ancestral lands, and that the Yakama treaty was abrogated at statehood. *State v. Wallahee*, 143 Wash. 117, 118-19, 255 P. 94 (1927).

## ANALYSIS

### Motion To Intervene

The State acknowledges "that *State v. Wallahee* was wrongly decided and is no longer good law." Letter from Bob Ferguson, Att'y Gen., Wash. State, to Wash. Sup. Ct. at 2 (Oct. 25, 2023). It questions whether there is an appropriate vehicle available to vacate the conviction and whether a proper party has presented it. *Id.*; *see also* Letter from Jesse J. Eldred, Deputy Prosecuting Att'y, Kittitas County, to Wash. Sup. Ct. at 1 (Sept. 18, 2023). The State, however, has not briefed either issue.

The motion before us to withdraw the mandate and vacate the conviction is presented by Jack Fiander on behalf of his now deceased client, Clyde Wallahee, a family member of Jim Wallahee. Clyde Wallahee, represented by Fiander,

unsuccessfully brought a motion in 2005, seeking an order vacating our prior decision. Before his death in 2007, Clyde Wallahee instructed Fiander to continue the effort to disavow the 1927 decision. In the wake of our opinion in *Towessnute*, Fiander has now renewed the motion on behalf of his client.

It is undisputed that Fiander represented the family's efforts in the past and we have been given no reason to believe he is not properly continuing to do so now. Accordingly, we grant the Wallahee estate (Estate) leave to intervene.

## Standing

"Standing generally refers to a particular party's right to bring a legal claim." *Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 711, 445 P.3d 533 (2019). Our standing analysis is unusual because this is not an original action brought under a statute or common law cause of action. Instead, this is a motion filed in the original 1926 case before this court, *State v. Wallahee*, No. 20439. Plainly, Jim Wallahee himself had standing to appeal his conviction. *See* WASH. CONST. art. I, § 22.

Typically, a party has standing when they (1) present an interest that is arguably within the zone of interests protected by the law asserted and (2) have been injured by the thing they challenge. *Wash. State Hous. Fin.*, 193 Wn.2d at 711-12. Standing requirements are relaxed in cases of serious public importance.

7

*Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County*, 77 Wn.2d 94, 96, 459 P.2d 633 (1969). To the extent necessary given the procedural posture before us, we find the Estate has satisfied both prongs.

The Estate seeks to vindicate Jim Wallahee's treaty right to hunt and to redress the injury his conviction has done to him and his family. Both this court and the legislature have recognized the wrong done to tribal members because they exercised their treaty rights to fish. *See Towessnute*, 197 Wn.2d 574; RCW 9.96.060(4). In recognition of the generational harm caused by these convictions, the legislature did not limit relief to living persons. Instead, it specifically allowed family members and official representatives of a deceased person's tribe to apply to have such convictions vacated. RCW 9.96.060(4). The House Committee on Community Development, Housing & Tribal Affairs noted testimony that in many tribal cultures, "the pain and burden of ancestors is passed along to future generations after their death. It is very important to wash away these burdens." H.B. REP. ON SUBSTITUTE H.B. 2080, at 4, 63d Leg., Reg. Sess. (Wash. 2014). The Senate Committee on Law and Justice summarized the testimony that committee heard:

> This bill is an attempt to rectify some of the wrongs that were committed against these tribes. The elders of these tribes and tribal members experienced injustice and are still being affected by this injustice. We have a responsibility to put this past behind us, have

8

respect, and do what we can to heal these wounds. State agents made repeated aggressive arrests for fishing activities, doing anything they could to deter the exercise of these treaty rights. We should do all we can to repair this injustice. We have an opportunity to take action and honor the tribes and their elders.

S.B. REP. ON SUBSTITUTE H.B. 2080, at 3, 63d Leg., Reg. Sess. (Wash. 2014).

RCW 9.96.060(4) addresses the vacatur of fishing convictions, but the right to fish does not stand alone in the Yakama treaty. Rather, the right to fish is bundled in the same sentence with the right to hunt, gather, and pasture livestock:

> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

Treaty with the Yakamas, *supra*, art. III.

In this case, we are faced with a clear violation of a treaty right. Both this court and the legislature have recognized that this is the sort of wrong that demands a remedy and is a matter of public importance. *See Towessnute*, 197 Wn.2d 574; RCW 9.96.060(4). While this motion was not brought under RCW 9.96.060(4), we find the statute and its legislative history instructive. Plainly, Mr. Wallahee's family and tribe have an interest the law should protect. The first prong is met.

For similar reasons, we find the second prong has been met. While the redress may be symbolic, both this court and our legislature have recognized its importance. *See* RCW 9.96.040(4); *In re Admission to Bar of Takuji Yamashita*, 30 Wash. 234, 70 P. 482 (1902), *disapproved*, 143 Wn.2d xxxiii-lix (2001) (transcript of the ceremony recognizing the injury done to Takuji Yamashita, posthumously admitting him to the bar, and presenting his family with his certificate of admission). Accordingly, we conclude the Estate has standing.

Motion To Withdraw the Mandate

Generally, this court will withdraw its mandate only to determine if the trial court has complied with a decision in the same case, to correct an inadvertent mistake, or to modify a decision obtained by fraud. RAP 12.9. But we will waive or modify our rules in order to serve the needs of justice subject to limitations not present here. RAP 1.2(c). We also have both the authority and the responsibility to strike down our precedent when it is incorrect and harmful. *Garfield County Transp. Auth. v. State*, 196 Wn.2d 378, 390 n.1, 473 P.3d 1205 (2020) (citing *Deggs v. Asbestos Corp.*, 186 Wn.2d 716, 727-28, 381 P.3d 32 (2016)); Letter

from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. (June 4, 2020).[2]

Both actions are necessary here.

Our 1927 opinion was incorrect on the law. That opinion asserted that the treaty between the United States and the Yakama Nation was terminated at statehood. *Wallahee*, 143 Wash. at 118-19. But treaties between the United States and Native Tribes are "the supreme law of the land and [are] binding on the State" no less than on the federal government. *State v. Buchanan*, 138 Wn.2d 186, 201, 978 P.2d 1070 (1999) (citing U.S. CONST. art. VI); *accord Herrera*, 139 S. Ct. at 1691-92. Our holding further suggested that treaty rights are a privilege granted by the United States government, when they are in fact fundamental rights reserved by sovereign tribes. *See United States v. Winans*, 198 U.S. 371, 381, 25 S. Ct. 662, 49 L. Ed. 1089 (1905).

But our opinion went beyond misinterpreting the law and also advanced many centuries' worth of harmful tropes about Native Americans. *Wallahee*, 143 Wash. at 118. This court's assertion that the Yakama people are "mere occupants" of their ancestral homelands echoes the Doctrine of Discovery's language, flows directly from the United States Supreme Court's opinion in *Johnson*,[3] and is the

---

[2] https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%2006060420.pdf [https://perma.cc/QNT4-H5P7]

[3] "It is a violation of the rights of others to exclude them from the use of what we do not want, and they have an occasion for. Upon this principle the North American Indians could have

same logic the United States government used to justify violent policies such as the Indian Removal Act of 1830[4] and the Indian General Allotment Act of 1887.[5, 6] *Id.*

Removal, allotment, and Jim Wallahee's conviction all stem from the belief that Native Americans lack basic human and equal rights and therefore treaties with them may be disregarded. We have a duty to explicitly repudiate that belief and to disavow our opinions that reflected that belief. We do so today.

CONCLUSION

Our decision in *Wallahee* was incorrect about the nature of treaties and treaty-protected rights, relied on precedent that has since been abrogated, and advanced justifications for violence against Native people. Mr. Wallahee's conviction was incorrect on the law, harmful, and an injustice.

Our nation's history is rife with such injustices. It is no victory to sanitize the past, but there is a difference between erasing history and redressing harm. This

---

acquired no proprietary interest in the vast tracts of territory which they wandered over; and their right to the lands on which they hunted . . . . According to every theory of property, the Indians had no individual rights to land; nor had they any collectively, or in their national capacity; for the lands occupied by each tribe were not used by them in such a manner as to prevent their being appropriated by a people of cultivators." *Johnson*, 21 U.S. at 569-70.

[4] Ch. 148, 4 Stat. 411 (1830).

[5] Ch. 119, 24 Stat. 388 (1887).

[6] Under these laws the United States forced Native people on deadly marches to reservations in "Indian Territory" and, later, sold two-thirds of those promised reservation lands to settlers, fractioning reservations and decimating many Native communities. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, *supra*, §§ 1.03(4)(a) at 48-49, 16.03(2)(b) at 1074.

court's wrongful decision can be characterized as an instructive feature of the past only by those who do not feel its sting in the present. The Doctrine of Discovery and its use in law to justify state-sponsored violence are a stain on this nation. Today we take a step toward reconciliation: we grant the motion to intervene, grant the motion to recall the mandate, and grant the motion to vacate Mr. Wallahee's conviction.

_____
González, C.J.

WE CONCUR:


_____        _____
Johnson, J.                                                    Gordon McCloud, J.


                                                               _____
                                                               Yu, J.


_____        _____
Owens, J.                                                     Montoya-Lewis, J.


                                                               _____
                                                               Whitener, J.

*State v. Wallahee (Jim) et al.*

No. 20439-0

MADSEN, J. (dissenting)—While the arc of the moral universe may bend toward justice, it does not do so on its own but through the persistent work of soberly confronting our history and learning from it. Despite 200 years of national life, we have barely begun this work. The simple act of recognizing our past—its freedom and oppression, justice and violence of the majority against the minority—remains a daunting challenge. Yet, while it is important to acknowledge injustice, it is also important to consider what tools we use to address it.

In my view, *whether* and *how*—the process by which we reach back in time to review a case is equally as important as the result because it affects the integrity of the judicial system and the public's trust in the institution. As the highest court in Washington, we must balance our duty to the individual litigant and to the collective citizens. *See State ex rel. Wash. State Fin. Comm. v. Martin*, 62 Wn.2d 645, 665, 384 P.2d 833 (1963) (this court's decisions bind all state courts and are often the last words on legal matters for Washingtonians). This balance is difficult, and we do not always get

it right. Here, the estate of Clyde Wallahee (Estate) identifies a time we did not get it right. The foundation of *State v. Wallahee*, 143 Wash. 117, 255 P. 94 (1927), has been overturned, and *Wallahee* is no longer good law. The decision itself contains discriminatory language. Nevertheless, the rules by which we all have agreed to abide do not permit the relief requested by the Estate. This is so because the party seeking to recall the mandate lacks standing.

The majority disagrees, finding standing under a theory no party argued or proved. Majority at 7-10. In doing so, the majority chips away at our responsibility to decide cases for the collective citizens of this state, not just for the individual. *See Martin*, 62 Wn.2d at 665. Of course, we must reach just results. *E.g.*, *State v. Lopez*, 190 Wn.2d 104, 410 P.3d 1117 (2018) (stating that the adversarial legal system depends on "just results"). But if we disregard the means by which we reach those results, the law becomes about only the individual. It becomes unpredictable and arbitrary, determined not by precedent but on a case-by-case basis. *See State v. Stalker*, 152 Wn. App. 805, 810-11, 219 P.3d 722 (2009) (citing *In re Pers. Restraint of Mercer*, 108 Wn.2d 714, 720-21, 741 P.2d 559 (1987)). The values and feelings of judicial decision-makers becomes paramount to all else. *Id.* at 811. That is not, and should not be, our system.

Adherence to precedent and our judicial process compels the result here. The Estate, the descendants of Jim Wallahee, who was convicted of illegally hunting deer, does not have standing and thus we cannot reach the merits of the Estate's claims. By summarily recalling the mandate and vacating Wallahee's conviction, the majority does

2

not follow the procedure that binds *all other litigants*. I agree that this court's decision in *Wallahee* is no longer good law, nor is Wallahee's underlying conviction. But ignoring binding precedent and erasing the case from our history is not the way we review and overrule past cases. I respectfully dissent.

ANALYSIS

<u>Standing</u>

Standing is generally a "party's right to bring a legal claim." *Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 711, 445 P.3d 533 (2019). The party seeking review bears the burden of proving standing. *Sarepta Therapeutics, Inc. v. Wash. State Health Care Auth.*, 19 Wn. App. 2d 538, 549, 497 P.3d 454 (2021). We review standing de novo. *In re Est. of Becker*, 177 Wn.2d 242, 246, 298 P.3d 720 (2013). A party has standing when they can demonstrate, first, an injury "'fairly traceable to the challenged conduct and likely to be redressed by the requested relief,'" and, second, a cognizable interest within the "'zone of interests protected by *the statute*'" at issue. *Bavand v. OneWest Bank, FSB*, 196 Wn. App. 813, 834, 385 P.3d 233 (2016) (emphasis added) (internal quotation marks omitted) (quoting *State v. Johnson*, 179 Wn.2d 534, 552, 315 P.3d 1090 (1986)). Assuming the Estate meets the first requirement, it does not satisfy the second.

The parties and the record do not identify the criminal statute Wallahee was convicted of violating.[1] RCW 9.96.060(4) allows family members or a tribe to seek to vacate convictions of deceased individuals for *fishing* violations that are protected by treaty right. Currently, no statute allows vacation of a hunting conviction.

The Estate acknowledges RCW 9.96.060(4) does not provide standing. Rather, "the relief sought by petitioner is *not* premised upon [the statute], . . . the relief sought is premised upon RAP 1.2 (c)." Pet'r's Reply Br. at 4.[2] The Estate does not explain how RAP 1.2(c) provides standing.

RAP 1.2(c) allows us to waive the appellate rules in the interests of justice. But even so, there is no cognizable interest protected by statute or rule in this case. RAP 1.2(c) does not confer a freestanding right for a party to prosecute a claim. *See Sarepta*, 19 Wn. App. 2d at 549.

---

[1] The attorney general suggests the statute may have been a provision setting allowable deer harvest limits and prohibited taking of any female deer in certain counties. Letter from Bob Ferguson, Att'y Gen., Wash. State, to Wash. Sup. Ct. at 2 (Oct. 25, 2023).

[2] The majority relies on the standing test set out in *Washington State Housing Finance Commission*, 193 Wn.2d at 711-12. Majority at 7. But that case, indeed most of our case law on standing, occurs in the specific context of a party seeking declaratory relief under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW. The Estate did not bring this case under the UDJA or argue for declaratory relief. Further, *Washington State Housing Finance Commission* does not confer standing even if it had been raised. The case states that a party has standing pursuant to the UDJA when "'the interest sought to be protected is arguably within the zone of interests to be protected or regulated by the *statute or constitutional guarantee* in question.'" *Wash. State Hous. Fin. Comm'n*, 193 Wn.2d at 711-12 (emphasis omitted) (internal quotation marks omitted) (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004)). As noted, the Estate did not argue that a statute or a constitutional guaranty provided standing. *Contra* majority at 7-9.

The Estate cites *Sutton v. Hirvonen*, 113 Wn.2d 1, 9, 775 P.2d 448 (1989), as

supporting standing under RAP 1.2. Br. in Supp. of Mot. to Intervene Post-Decision & in

Supp. of Pet. to Recall Mandate & Vacate Op. at 2-3. *Sutton* concerned, in part, the

intervention of an insurance company in an appeal of an automobile accident action. 113

Wn.2d at 3-6. A lower court in that case had already stated that the insurance company

could be "independently liable"; thus, this court analogized appellate intervention to CR

24(a) providing for mandatory intervention. *Id.* at 8. The court waived the appellate

rules in the interest of justice and considered the issue. *Id.* at 8-9 (citing RAP 1.2(a), (c);

RAP 18.8(a)). In other words, a reviewing court may consider an issue that was not

raised in the trial court if justice demands. *Sutton* may support the petitioner's

intervention on the Estate's behalf, but it does not support the Estate's claim to standing.

This court's inherent authority to overrule a case does not confer standing either.

*See* majority at 10. To overrule an incorrect and harmful decision, a party with standing

must present and argue the issue. *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27

P.3d 1149 (2001) (listing the requirements for a court to hear a justiciable controversy);

*Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 278, 208 P.3d 1092 (2009).

Absent those conditions, "the court steps into the prohibited area of advisory opinions."

*Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973). The

Estate does not identify an interest protected by statute or rule.[3] Accordingly, it does not

---

[3] The majority concludes that RCW 9.96.060(4) confers standing. Majority at 9. But by its plain language, the provision does not include Wallahee's conviction for illegal hunting—it applies only to fishing convictions. RCW 9.96.060(4) ("Every person convicted prior to January 1,

have standing to bring the current action—despite the legally incorrect original

conviction and offensive language in this court's decision to uphold it.

Recalling the Mandate

A "mandate" is the written notification from the clerk of an appellate court to the

trial court and parties terminating review. RAP 12.5(a). This court may recall a mandate

within a "reasonable time" if necessary to correct an inadvertent mistake, or remedy a

fraud of a party or counsel, or to determine if the trial court has complied with our earlier

decision in the same case. RAP 12.9(a)-(c); *Shumway v. Payne*, 136 Wn.2d 383, 393,

964 P.2d 349 (1998) (1,000-day delay not reasonable). We may not recall a mandate for

the purpose of reexamining the case on its merits. *Shumway*, 136 Wn.2d at 393; *Kosten*

*v. Fleming*, 17 Wn.2d 500, 505, 136 P.2d 449 (1943) ("'[A]n appellate court is without

power to recall a mandate regularly issued without inadvertence, fraud, prematurity, or

misapprehension, and . . . it will not recall the mandate for the purpose of re-examining

the cause on the merits, for the purpose of granting supplemental relief.'" (quoting 5

C.J.S. *Appeal and Error* § 1996 (1937))). The mechanism for reexamining a case on the

merits is to grant reconsideration. RAP 12.4; 3 ELIZABETH A. TURNER, WASHINGTON

---

1975, of violating any statute or rule regarding the regulation of *fishing activities* . . . may apply
to the sentencing court for vacation of the applicant's record." (emphasis added)). We must
interpret the plain language of a statute, unless that language is ambiguous. *Dep't of Ecology v.
Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002). RCW 9.96.060(4) is not
ambiguous and no party has so argued. Because RCW 9.96.060(4) does not include language
allowing for vacatur of a hunting conviction, the provision does not provide standing. Moreover,
the Estate *expressly* acknowledged that it brought this case under RAP 1.2(c) and not under
RCW 9.96.060(4). Pet'r's Reply Br. at 4. Proving standing falls to the party seeking it, not this
court. *Sarepta*, 19 Wn. App. 2d at 549. It is not for us to recognize a theory of standing
unargued by the parties and where it does not exist.

PRACTICE: RULES PRACTICE RAP 12.4 author's comments at 175 (9th ed. 2022) ("[A] motion for reconsideration seeks to persuade the court to change its decision on the merits."). Rules governing reconsideration provide a brief time period to seek such relief. RAP 12.4(b) (a motion for reconsideration must be filed within 20 days after the decision to be reconsidered is filed in the appellate court).

The majority has no concerns with recalling the mandate and revisiting this case, noting we also have the responsibility to strike down precedent that is incorrect and harmful. Majority at 10; *Lunsford*, 166 Wn.2d at 278. Our appellate rules and the precedent interpreting them are not equivocal, however. We are precluded from recalling a mandate to reexamine a cause on the merits for the purpose of granting supplemental relief. *Kosten*, 17 Wn.2d at 505.

As to our duty to overturn incorrect precedent, I agree with the majority that *Wallahee* is wrong on the law. Majority at 11. A decision may be "harmful" for many reasons. *See State v. Barber*, 170 Wn.2d 854, 865, 248 P.3d 494 (2011) (tracing cases finding precedent harmful due to its "detrimental impact on the public interest"); *State v. Blake*, 197 Wn.2d 170, 208, 481 P.3d 521 (2021) (Stephens, J., concurring in part, dissenting in part) (past drug possession decisions created a constitutional harm that has disproportionately affected marginalized groups). However, whether a decision should be overruled is decided within the context of a live controversy.

The constraint against rendering advisory opinions is rooted in "[f]undamental requirements of standing, justiciability, and the doctrine of mootness all derive[d] from

the basic requirement that cases be advanced by plaintiffs . . . in the outcome of a genuine controversy." *In re Disciplinary Proc. Against Deming*, 108 Wn.2d 82, 122, 736 P.2d 639 (1987) (Utter, J., concurring). This court's decision in *Wallahee* concerned offensive language about the independent sovereignty of the Yakama Tribe and "tropes about Native Americans." Majority at 11; *Wallahee*, 143 Wash. at 118. These statements are incorrect and offensive. But there has been no showing that *Wallahee* is *legally* harmful to constitute a genuine controversy. *See Deming*, 108 Wn.2d at 122. Nor has the party seeking to overturn *Wallahee* clearly shown that it was legally harmful. *Barber*, 170 Wn.2d at 865. That is not to say *Wallahee* has had *no effect*. Undoubtedly, it has on Jim Wallahee, his family, the Yakama Tribe, and the people of this state. To overturn precedent requires more, however, such as infringing on a constitutional protection. *Id.*; *State v. Otton*, 185 Wn.2d 673, 701-02, 374 P.3d 1108 (2016) (Gordon McCloud, J., concurring). *Wallahee* and the decisions it relies on are no longer good law. Consequently, any future harm to the legal rights of Yakama tribal members has been severed. *See State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022).[4]

The majority anchors its decision to grant relief in this case to our decision in *State v. Towessnute*, 197 Wn.2d 574, 578, 486 P.3d 111 (2020). But that case is inapplicable here. Alec Towessnute was charged with illegal fishing. *Id.* at 575-78. The party

---

[4] We have recognized that past opinions of this court can continue to perpetrate injustice by their very existence. *State v. Towessnute*, 197 Wn.2d 574, 578, 486 P.3d 111 (2020). We have not held that the existence of these cases is legally harmful such that we will bypass issues of standing, justiciability, and compliance with the applicable rules to overturn precedent.

seeking relief in in that case appears to have had standing under RCW 9.96.060(4). *Id.* at 577 n.1. Accordingly, we addressed the merits and vacated any conviction stemming from Towessnute's lawful exercise of his right to fish in the usual and accustomed waters. *Id.* at 578. As noted, the Estate does not have standing. Unlike *Towessnute*, this precludes us from addressing the merits. Though factually similar, these cases are distinct and those distinctions are dispositive.

CONCLUSION

"Injustice has many faces and forms, and some of its history lies in the past opinions of this court." *Id*. at 575; *see also* Letter from the Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. at 1 (June 4, 2020).[5] Today's case, as in *Towessnute*, presents another historical injustice. But, unlike *Towessnute*, the moving party here has no standing and thus we cannot decide how to right this historical wrong. The majority decides the case nonetheless and compounds its error by recalling the mandate and granting relief contrary to our appellate rules and case law interpreting them. I cannot sign on to a decision that, in the pursuit of justice, sets aside processes binding all litigants who seek justice.

I also respectfully disagree that overturning and removing *Wallahee* is the best solution. Doing so risks destroying physical evidence that this court has discriminated against Native people, easing the way for future generations to look back and conclude

---

[5]https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7]

that it never existed at all.  *See In re That Portion of Lots 1 & 2*, 199 Wn.2d 389, 401, 506

P.3d 1230 (2022).  "'A policy of whitewashing public records and erasing historical

evidence of racism would be dangerous.  It would risk forgetting and ultimately denying

the ugly truths of racism,'" which "'cannot be squared with the antidiscrimination'" work

of those fighting to bend the moral arc of history.  *Id.* (quoting *In re That Portion of Lots*

*1 & 2*, 16 Wn. App. 2d 505, 515, 481 P.3d 1098 (2021)); *see* Letter from the Wash. State

Sup. Ct., *supra*.

Removing all trace of the offensive language and tropes in *Wallahee* salves the

shame of discrimination by erasing that shame.  It does not eradicate it.  *See Portions of*

*Lots 1 & 2*, 199 Wn.2d at 401.  Rather than wiping away the discomfort and shame of

past decisions, allowing the case to exist (disavowed and without authority) helps ensure

that future generations can see the documented history of discrimination and

disenfranchisement of a people.  *Id.*  It is our history.  We cannot forget it.

For these reasons, I respectfully dissent.

_____Madsen, J._____
Madsen, J.

_____Stephens, J._____
Stephens, J.

10