**FILED**
**MAY 19, 2026**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) ) ) | No. 40967-8-III |
| RAMON MORFIN, | ) ) ) | |
| Petitioner. | ) ) ) | UNPUBLISHED OPINION |

COONEY, J. — At the conclusion of a bench trial, Ramon Morfin was convicted of

two counts of assault in the first degree while armed with a firearm. His convictions

were affirmed on direct appeal. Mr. Morfin now brings this personal restraint petition

(PRP), asserting insufficient evidence was presented at trial to support the convictions.

Alternatively, Mr. Morfin requests this court recall its mandate in the direct appeal and

reverse his convictions.

We conclude sufficient evidence was admitted at trial to support the convictions

and therefore deny Mr. Morfin's petition. We also deny Mr. Morfin's request to recall

the mandate in the direct appeal.

BACKGROUND

Gunshots were fired at Paula Villarreal and Debra Villarreal[1] on August 29, 2011, at 9:39 p.m., while they sat in a parked vehicle at a Motel 6 in Pasco, Washington. One bullet struck Paula in the face, and multiple bullets struck the vehicle. Law enforcement responded and recovered eight .45 caliber shell casings but never located the firearm. Law enforcement believed Debra was an 18th Street gang member, a rival of the Florencia gang. This resulted in law enforcement securing the rooms of suspected Florencia gang members in the Motel 6.

Detective Kirk Nebeker of the Pasco Police Department responded and interviewed three Motel 6 guests, including Mr. Morfin. No arrests were made and no suspects were singled out on the night of the shooting. Early the next day, Detective Nebeker viewed a video recording of the shooting. Detective Nebeker identified Mr. Morfin as the shooter in the recording. Mr. Morfin was charged with two counts of assault in the first degree, each with a firearm enhancement and alleged criminal street gang aggravator.

The case proceeded to a bench trial. Officer Ismael Cano of the Pasco Police Department was the first officer to arrive at the scene of the shooting and contact Mr.

---

[1] We refer to Paula and Debra Villareal by their first names for clarity. No disrespect is intended.

Morfin.  Detective Nebeker responded later and interviewed possible suspects, including

Mr. Morfin.  Mr. Morfin admitted to Detective Nebeker that he was present at the Motel

6 when the shooting occurred but denied any involvement in the shooting.  Detective

Nebeker recalled Mr. Morfin was wearing "a gray long-sleeved shirt with dark shorts"

when contacted.  Rep. of Proc. (RP) at 16.  Detective Nebeker did not "recall if they were

like dark blue or black, but they were dark long shorts."  RP at 16.  Although others who

were present during the shooting wore shorts or long-sleeved shirts, "no one else had

long-sleeved gray shirt[s] with dark shorts.  [Mr. Morfin] was the only one."  RP at 16.

Three surveillance cameras from the Motel 6 recorded the events of August 29,

2011.  Detective Nebeker did not identify Mr. Morfin as the shooter until he reviewed the

recording.  In describing the videos to the court, Detective Nebeker stated, "[Y]ou can

see a group of people hanging around a vehicle," a "black Mercedes," and "you can see

people start to kind of scramble," then "[y]ou can see who I identify as Mr. Morfín lean

over the car, and you can see the fire from the muzzle as shots go out.  Then you can see

people run and scramble."  RP at 18.  Detective Nebeker claimed he saw "a different

person in a dark shirt [he] believe[d] to be Manuel Ramirez run back to the Mercedes."

RP at 18.  The recordings were admitted into evidence.

In reference to the recordings, Detective Nebeker testified, "Those are the blasts

from the muzzle of the gun.  And he's wearing the same attire as Mr. Morfin when I

interviewed him."  RP at 23.  The detective further testified, "And then this is who I

3

believe is Manuel Ramirez, who also had long dark shorts, but he had a dark top." RP at 23.

In support of his identification of Mr. Morfin, Detective Nebeker stated, "I know him; I know his face, and that was him." RP at 31. Detective Nebeker recounted, "[W]hen I first started over 11 years ago, [Mr. Morfin] was the first person who actually ran from me in a field contact at Memorial Park. I remembered him ever since." RP at 57. Although Detective Nebeker and Mr. Morfin "had not talked face to face a whole lot," Detective Nebeker testified that "there has been multiple contacts." RP at 57. Detective Nebeker further recognized Mr. Morfin's "body shape would be the same as the person [he] interviewed" and concluded Mr. Morfin was the shooter based on "all the factors combined." RP at 58. In support of his identification of Mr. Morfin, Detective Nebeker claimed that after watching the recording, "it clicked and [he] knew." RP at 58.

During cross-examination, Detective Nebeker was questioned about a statement in his report:

> I am able to view the clothing, and I am able to see that the shooter who had the gun and *appeared* to be the only one to have a gun and was wearing the same clothing and the same body build and appeared to have the same hairstyle as Ramón Morfín, who I had interviewed earlier.

RP at 36 (emphasis added). Detective Nebeker claimed he used the word "appeared" "because [he] cannot say definitive, that it was consistent, that that's what it appeared." RP at 36. Detective Nebeker admitted he was unable to "make out" the faces of the

4

individuals in the recording because the recording was "too blurry." RP at 41. In the recording, the detective identified "[f]our to five, maybe six" individuals around the vehicle at the time of the shooting and was unable to say "one way or the other" whether someone was sitting in the Mercedes. RP at 42-43.

Detective Nebeker observed an individual in the recording leaning over the Mercedes, "[a]nd at the end of his hands is where the flash goes. It's obviously to [Detective Nebeker] a firearm." RP at 44. The individual he identified as "leaning over" was wearing a "[g]ray long-sleeved shirt." RP at 44. Detective Nebeker was unable to recall what each of the individuals he interviewed was wearing, but "no one else had the gray long-sleeved shirt with the dark shorts." RP at 55-56.

Detective Nebeker testified the shooter was distinguished in the video by his clothing and "[b]ody build" and acknowledged that "it is possible someone could by the time [he] responded [to Motel 6] change their attire." RP at 49-50. He also agreed it was possible that more individuals could have left or joined the group, and that he did not definitively know whether the individuals gathered around the black Mercedes were Florencia gang members.

Sergeant Bradford Gregory testified that law enforcement "had detained three people in a hotel room," including Mr. Morfin, when he arrived at the Motel 6. RP at 108. Sergeant Gregory could not recall whether he had "dealt with Mr. Morfin" prior to

the night of the shooting. RP at 109. Sergeant Gregory encountered Mr. Morfin the night of the shooting "sitting outside of the hotel with the other guys." RP at 112.

Sergeant Gregory did not view the recording until September 6 and recognized Mr. Morfin as the shooter based on his "[b]ody style, clothing. It was clearly [Mr. Morfin]." RP at 129. Sergeant Gregory testified, "I looked at the video, I looked at the people we were talking to that night, and it appeared to me that it was Mr. Morfin that was standing over the vehicle firing the shots." RP at 130. Sergeant Gregory admitted, "You clearly couldn't see the facial features from that video" nor any tattoos. RP at 130. Although Sergeant Gregory was unable to say whether the shooter was "really tall" or "really small," Sergeant Gregory was able to identify Mr. Morfin by his size and body style. RP at 131.

At the conclusion of the trial, the court found Mr. Morfin guilty of two counts of assault in the first degree, each with a firearm enhancement. The court did not find the aggravators for gang motivation. Mr. Morfin was later sentenced to 462 months of confinement.

On direct appeal, Mr. Morfin argued he was afforded ineffective assistance of counsel when his attorney failed to object to the officers' identification testimony and to Mr. Ramirez's confirmation of Detective Nebeker's suspicion that Mr. Morfin was the shooter. *State v. Morfin*, No. 33169-5-III (Wash. Ct. App. July 7, 2016) (unpublished) https://www.courts.wa.gov/opinions/pdf/331695.unp.pdf. This court held that defense

counsel was deficient for not objecting to the inadmissible hearsay statements attributed to Mr. Ramirez, but any error was harmless because "[t]he critical evidence was the testimony of the two officers linking the clothing seen in the video to that worn by Mr. Morfin at the time of the incident," and the statements made by Mr. Ramirez did not play a part in the trial court's determination. *Morfin*, slip op. at 8. In a footnote, this court noted that "although the video was so grainy that the shooter's face could not be identified, the shooter's clothing was sufficiently discernable in the video to support the identification testimony based on the clothing alone." *Id.* at 9 fn.4.

Mr. Morfin now brings this PRP.

## ANALYSIS

SUFFICIENCY OF EVIDENCE

Mr. Morfin argues there was insufficient evidence to support his convictions because the State failed to prove he was the individual involved in the shooting. We disagree.

PRPs must generally be brought within one year of a judgment becoming final, subject to some limited exceptions. *See* RCW 10.73.090(1). Mr. Morfin asserts his petition falls under an exception to the time bar because the convictions were not supported by sufficient evidence. Indeed, this type of claim is exempt from the one-year time bar. RCW 10.73.100(4). Accordingly, the question of whether Mr. Morfin's petition is timely turns on the substance of his sufficiency of the evidence claim.

7

Obtaining relief through a collateral attack on a conviction is an extraordinary remedy and necessitates overcoming a high standard. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). To obtain relief through a PRP, the petitioner is required to show unlawful restraint. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 363, 256 P.3d 277 (2011). A person is under "restraint" if the person is confined. RAP 16.4(a). An offender incarcerated in a correctional facility is necessarily "confined" and thus under "restraint" for purposes of RAP 16.4(a). *In re Pers. Restraint of Stuhr*, 186 Wn.2d 49, 52, 375 P.3d 1031 (2016). Mr. Morfin is incarcerated and is therefore under restraint.

To show the restraint is unlawful, a petitioner is required to demonstrate by a preponderance of the evidence that there was a constitutional error that actually and substantially prejudiced them or that they suffered a nonconstitutional fundamental defect at trial "that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013); *see also In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). "To show actual and substantial prejudice, a petitioner must show that the outcome would more likely than not have been different had the alleged error not occurred." *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 86, 514 P.3d 653 (2022). The court considers the totality of the circumstances in determining whether the petitioner has met their burden of

demonstrating prejudice. *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013).

Due process requires that the State meet its burden of proof beyond a reasonable doubt for every essential element of a crime. *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994). "A conviction based on insufficient evidence contravenes the due process clause of the Fourteenth Amendment [to the United States Constitution] and thus results in unlawful restraint." *Martinez*, 171 Wn.2d at 364. Sufficiency of the evidence is a question of law this court reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

In a sufficiency of the evidence analysis, the court considers whether "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We employ the same sufficiency of the evidence test in reviewing a conviction resulting from a bench trial. *See State v. Roberts*, 5 Wn.3d 222, 236-37, 572 P.3d 1191 (2025).

A challenge to the sufficiency of the evidence "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). We defer to the trier of fact on issues of conflicting testimony, witness

credibility, and the persuasiveness of evidence. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). The remedy for insufficient evidence is dismissal with prejudice. *State v. Irby*, 187 Wn. App. 183, 204, 347 P.3d 1103 (2015).

Mr. Morfin argues the evidence admitted at trial was insufficient to prove he was the individual who shot the firearm at Paula and Debra at the Motel 6 on August 29, 2011.

As a preliminary matter, this court previously held that Detective Nebeker's testimony that Mr. Ramirez confirmed his suspicion that Mr. Morfin was the shooter was inadmissible. Consequently, we exclude the testimony from our consideration of whether there was sufficient evidence to convict Mr. Morfin. *See e.g.*, *In re Pers. Restraint of Knight*, 2 Wn.3d 345, 356, 538 P.3d 263 (2023).

We next turn to the merits of Mr. Morfin's claim.

The State presented sufficient evidence from which any rational trier of fact could have found beyond a reasonable doubt that Mr. Morfin was the shooter.

Mr. Morfin admitted he was present during the shooting and was promptly contacted by Officer Cano at the scene. Although law enforcement could not identify Mr. Morfin as the shooter on the night of the shooting, the video recording assisted both Detective Nebeker and Sergeant Gregory with their identifications. Detective Nebeker viewed the recording within hours of having contact with those present during the shooting. Mr. Morfin's attire and "body shape" were fresh in his mind when he viewed

the recording. RP at 58. Detective Nebeker was also able to distinguish Mr. Morfin's attire from all the individuals present at the shooting. Moreover, Detective Nebeker had a history with Mr. Morfin dating back 11 years and could recall when the two first met.

Similarly, Sergeant Gregory contacted Mr. Morfin on the night of the shooting. Although he could not recall whether he had previously "dealt with Mr. Morfin" and "couldn't see the facial features from that video," Sergeant Gregory recognized Mr. Morfin in the recording based on his "[b]ody style, clothing," and body size. RP at 109, 129-30.

The recording alone is certainly insufficient to demonstrate Mr. Morfin was the shooter. However, we are required to consider *all* the evidence presented at trial, viewing it in a light most favorable to the State and drawing all reasonable inferences from the evidence in favor of the State. In challenging the sufficiency of evidence, including the credibility of Detective Nebeker's and Sergeant Gregory's identifications of him, Mr. Morfin admits the truth of the State's evidence. We do not reweigh the evidence or evaluate the credibility of witnesses and defer to the trier of fact on the persuasiveness of the evidence. In applying these principles, the video recording, Detective Nebeker's testimony, and Sergeant Gregory's testimony in the aggregate supports the trial court's finding that Mr. Morfin was the shooter.

REQUEST TO RECALL MANDATE

In the alternative, Mr. Morfin requests we recall our mandate in the direct appeal and reverse his convictions. Essentially, Mr. Morfin renews his claim of ineffective assistance of counsel. We decline his request.

RAP 12.9 allows this court to withdraw its mandate to determine if the trial court has complied with a decision in the same case, to correct an inadvertent mistake, or to modify a decision obtained by fraud. We may also waive or modify our rules in order to serve the needs of justice subject to limitations not present here. RAP 1.2(c).

In support of his argument, Mr. Morfin directs us to *State v. Wallahee*, 3 Wn.3d 179, 548 P.3d 200 (2024), and *In re Personal Restraint of Rhone*, 1 Wn.3d 572, 528 P.3d 824 (2023). Unlike "the harmful logic that underpins" the wrongful conviction in *Wallahee* and the "unique factual and procedural history" of *Rhone*, Mr. Morfin's direct appeal did not rely on precedent that has since been abrogated, advance justifications for violence against Native people, or implicate racial discrimination. *Wallahee*, 3 Wn.3d at 181; *Rhone*, 1 Wn.3d at 574. Rather, in Mr. Morfin's direct appeal we held that his trial attorney was ineffective in failing to object to inadmissible hearsay, but the error was harmless beyond a reasonable doubt because there was no indication the trial court considered the statement as substantive evidence. *Morfin*, slip op. at 8-9. We find no compelling reason to revisit this decision.

12

CONCLUSION

We deny Mr. Morfin's PRP as well as his request to recall the mandate in the direct appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Staab, C.J.

_____
Lawrence-Berrey, J.

13