**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

OCTOBER 9, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 9, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| FLYING T RANCH, INC., a Washington corporation, | ) ) ) | No. 103430-0 |
| Petitioner, | ) ) | En Banc |
| | ) | |
| v. | ) | Filed: October 9, 2025 |
| | ) | |
| STILLAGUAMISH TRIBE OF INDIANS, a federally recognized Indian tribe, | ) ) ) | |
| Respondent, | ) ) | |
| | ) ) | |
| SNOHOMISH COUNTY, a Washington State municipal corporation, | ) ) ) | |
| Defendant. | ) ) | |

MADSEN, J.— Under federal common law, Indian tribes may be sued only under two circumstances: when a tribe waives its sovereign immunity or when Congress unequivocally abrogates tribal sovereign immunity. Here, Flying T Ranch (Flying T) filed suit in Snohomish County Superior Court to quiet title to nonreservation land purchased by the Stillaguamish Tribe of Indians (Tribe). Flying T contends it had

acquired that land through adverse possession prior to the Tribe's purchase. The superior court dismissed the case with prejudice based on the Tribe's sovereign immunity.

The primary issue before us is a matter of first impression: whether a common law immovable property exception waives tribal sovereign immunity. The Court of Appeals held that tribal sovereign immunity is not subject to an immovable property exception absent a clear waiver by Congress or the tribe itself. Congress has not clearly indicated its intent to abrogate tribal sovereign immunity here; therefore, we affirm the Court of Appeals.

FACTS

The Stillaguamish Tribe of Indians is a federally recognized Indian tribe. In 2021, the Tribe purchased a parcel of land located along the Stillaguamish River via statutory warranty deed. The Tribe purchased its parcel utilizing state and federal funding from a conservation grant from the National Oceanic and Atmospheric Administration, through the Washington State Recreation and Conservation Office. The main purpose of the grant is to protect the land in perpetuity with a deed of right for salmon recovery.

Upon acquiring title, the Tribe designated the plot as "conservation" land. Clerk's Papers at 86. The Tribe's interest in the land has been specifically for protecting the riparian habitat necessary for salmon, which is in turn tightly connected to the Tribe's treaty right to fish. As the Stillaguamish River salmon runs face extinction, so do many aspects of the Tribe's culture, community, and treaty reserved rights. By using these parcels as conservation land to protect and restore salmon in the Stillaguamish River, the

Tribe seeks to preserve their way of life. Prior to purchase, the land had not been part of any reservation.

Flying T, a Washington corporation domiciled in Snohomish County, has owned a parcel of land running adjacent to that of the Tribe's and county's parcels since 1991.

Snohomish County had acquired its portion of the disputed parcel of land along the Stillaguamish River in 1995. The land was privately owned prior to the county acquiring it.

In 2022, Flying T filed a complaint against Snohomish County and the Tribe in Snohomish County Superior Court, seeking to quiet title to a narrow strip of the two parcels of land described above by adverse possession. *Id*. at 84-85. Flying T contends that since at least 1962, it and its predecessors in interest have had continuous and exclusive possession over a narrow strip of both the Tribe's and county's parcels of land by and through their maintenance of a fence, which served to mark the boundary line, and their use of the land to graze and keep livestock. It contends that their possession has been actual, uninterrupted, open, notorious, exclusive, and hostile to any claim of right by all others.

The Tribe moved to dismiss pursuant to CR 12(b)(1)-(3), (6), and (7), based on tribal sovereign immunity. Before the court ruled on the motion to dismiss, Snohomish County conveyed its portion of the disputed parcel of land to the Tribe, and thus the Tribe acquired ownership of the entire disputed parcel. The superior court entered an order

granting the Tribe's motion to dismiss. Flying T moved for reconsideration, which was denied.

Flying T appealed, seeking direct discretionary review in this court. We denied the motion and transferred the case to the Court of Appeals.[1] Flying T argued that although tribes enjoy common law sovereign immunity, the scope of that immunity is limited by the common law immovable property exception, and since adverse possession claims affect title to real property, Washington superior courts have in rem jurisdiction over nonreservation land within state boundaries, even if owned by a tribe.

The Court of Appeals rejected Flying T's arguments and affirmed the superior court's dismissal of the quiet title action.[2] It concluded that "a foreign sovereign enjoys immunity as directed by the political branches of government and would not face process directed by the judiciary alone. When the Tribe is afforded immunity equal to a foreign

---

[1] After filing a notice of appeal, but before filing its statement of grounds for direct review, Flying T moved in the trial court to clarify whether the order dismissing the claims against the Tribe was a final, appealable order since Snohomish County was not dismissed from the suit. In April 2023, the trial court signed a new order stating that Snohomish County was dismissed from the action and that all claims against the Tribe were dismissed with prejudice. Flying T then filed a motion to clarify appealability or to extend time to file an amended notice of appeal in this court and filed an amended notice of appeal. The Tribe filed a motion to dismiss the appeal or any discretionary review based on Flying T's failure to timely appeal from the new April order. We transferred the case along with the motion to clarify and the motion to dismiss to the Court of Appeals.

[2] The parties dispute the Court of Appeals' holding. The Tribe states that the Court of Appeals held that there is no common law immovable property exception to tribal sovereign immunity, that cases finding an in rem exception to tribal sovereign immunity are no longer good law, and that only Congress can abrogate tribal sovereign immunity. Flying T states that the Court of Appeals correctly held that the immovable property exception should apply to tribes acquiring nonreservation land but erred when it deferred to Congress. The Court of Appeals in essence stated that even if a common law immovable property exception exists, it should not extend to tribal sovereign immunity absent some direction from Congress. *See Flying T Ranch, Inc. v. Stillaguamish Tribe of Indians*, 31 Wn. App. 2d 343, 359-62, 549 P.3d 727 (2024).

sovereign, it may be sued over its objection only when allowed by Congress, and to hold otherwise would unfaithfully lessen its immunity in comparison to that traditionally enjoyed by sovereign powers." *Flying T Ranch, Inc. v. Stillaguamish Tribe of Indians*, 31 Wn. App. 2d 343, 346, 549 P.3d 727 (2024). The court stated that Flying T has not shown "any history of the judiciary invoking the immovable property exception against a foreign nation to disallow foreign sovereign immunity without regard to the direction of the political branches." *Id*. at 358. It also noted that the codification of the Foreign Sovereign Immunities Act (FSIA) did not support application of a common law immovable property exception here absent congressional direction. Thus, Congress must act to limit tribal immunity. *Id*. at 371.

The court also recognized that prior Washington authority permitted quiet title claims like the one Flying T asserts here but stated that the rationale of the cases finding an in rem exception to tribal sovereign immunity was disapproved in *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 558, 138 S. Ct. 1649, 200 L. Ed. 2d 931 (2018). *Id*. at 351. The court declined to reach any other issues raised by the parties after determining the Tribe has immunity. *Id*. at 371.

Flying T petitioned for review, which this court granted. *Flying T Ranch, Inc. v. Stillaguamish Tribe of Indians*, 3 Wn.2d 1031 (2024).

ANALYSIS

Questions of federal law regarding tribal sovereign immunity are reviewed de novo. *Auto. United Trades Org. v. State*, 175 Wn.2d 214, 222, 226, 285 P.3d 52 (2012);

5

*Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp.*, 181 Wn.2d 272, 276, 333 P.3d 380 (2014) (whether a court has subject matter jurisdiction is a question of law that appellate courts review de novo).

*Tribal Sovereign Immunity*

Indian tribes are "'separate sovereigns pre-existing the Constitution.'" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978)). "Among the core aspects of sovereignty that tribes possess . . . is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Id.* (quoting *Santa Clara Pueblo*, 436 U.S. at 58); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512, 60 S. Ct. 653, 84 L. Ed. 894 (1940) (holding that "Indian Nations are exempt from suit without Congressional authorization"). Tribal sovereign immunity is "'a necessary corollary to Indian sovereignty and self-governance.'" *Bay Mills*, 572 U.S. at 788 (quoting *Three Affil. Tribes of Fort Berthold Rsrv. v. Wold Eng'g, PC*, 476 U.S. 877, 890, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986)); THE FEDERALIST NO. 81, at 511 (A. Hamilton) (Benjamin F. Wright ed. 1961) (it is "inherent in the nature of sovereignty not to be amenable" to suit without consent).

Thus, as the United States Supreme Court has explained, the "baseline position" is tribal immunity, and federally recognized Indian tribes may be sued only when either a tribe has waived its immunity or Congress has "'unequivocally'" abrogated tribal immunity. *Bay Mills*, 572 U.S. at 790 (quoting *C&L Enters., Inc. v. Citizen Band*

*Potawatomi Tribe of Okla.,* 532 U.S. 411, 418, 121 S. Ct. 1589, 149 L. Ed. 2d 623

(2001)); *see Santa Clara Pueblo*, 436 U.S. at 58 (waiver of sovereign immunity cannot

be implied; it must be unequivocally expressed). Tribal sovereign immunity "is a matter

of federal law and is not subject to diminution by the States." *Kiowa Tribe v. Mfg.*

*Techs., Inc.*, 523 U.S. 751, 756, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998). The United

States Supreme Court has "time and again treated the 'doctrine of tribal immunity [as]

settled law' and dismissed any suit against a tribe absent congressional authorization (or a

waiver)." *Bay Mills*, 572 U.S. at 789 (alteration in original) (quoting *Kiowa*, 523 U.S. at

756).

Tribal sovereign immunity is broad. In fact, tribes enjoy broader immunity than

foreign sovereigns in some contexts. For example, a tribe's immunity from suit extends

to contracts, whether involving governmental or commercial activities and whether they

are made on or off a reservation. *Kiowa*, 523 U.S. at 760; *cf.* 28 U.S.C. § 1605(a)(6)

(contractual exception to the jurisdictional immunity of a foreign state).

While tribes enjoy immunity like other sovereigns do, the Court has long

recognized the federal government's unique relationship with Indian tribes as compared

to foreign nations. A tribal nation is not "foreign to the United States." *Cherokee Nation*

*v. Georgia*, 30 U.S. (5 Pet.) 1, 19, 8 L. Ed. 25 (1831). Instead, the Court has referred to

tribes as "domestic dependent nations" that engage in government-to-government

relations with the United States. *Id.* at 17. Because of the unique relationship that tribes

have with the federal government, sovereign immunity concepts applicable to foreign

nations do not always apply identically in the tribal context. *E.g.*, *Kiowa*, 523 U.S. 751.

Further, tribal sovereign immunity "is not coextensive with that of the States." *Id*. at 756.

Thus, only Congress and the tribes themselves retain the power to determine when tribal

immunity may be waived.

*Prior Limitations on Tribal Sovereign Immunity*

Prior Washington case law held that superior courts in Washington may exercise

in rem jurisdiction to settle disputes over tribally owned, nonreservation land. *Lundgren*

*v. Upper Skagit Indian Tribe*, 187 Wn.2d 857, 865, 389 P.3d 569 (2017), *vacated and*

*remanded*, 584 U.S. 554. In *Lundgren*, the issue was whether the Tribe's assertion of

sovereign immunity required dismissal of an in rem adverse possession action to quiet

title to a disputed strip of land on the boundary of property purchased by the Tribe. We

held that the Tribe's sovereign immunity was no barrier to the in rem proceeding.

However, in reaching this conclusion, the court relied heavily on a case that the United

States Supreme Court later stated does not support our holding.

In *Lundgren* our court stated, "A court exercising in rem jurisdiction is not

necessarily deprived of its jurisdiction by a tribe's assertion of sovereign immunity." *Id*.

at 865-66. We noted that the United States Supreme Court recognized this principle in

*County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S.

251, 255, 112 S. Ct. 683, 116 L. Ed. 2d 687 (1992). *Id*. In *Yakima*, the county sought to

foreclose property within the Yakama Indian Reservation for failure to pay ad valorum

taxes. 502 U.S. at 256. The Yakama Nation argued that federal law prohibited these

taxes on fee-patented reservation land. *Id*. The United States Supreme Court held that the Indian General Allotment Act of 1887, 25 U.S.C. §§ 331-358, *repealed in part by* Pub. L. No. 106-462, 114 Stat. 1991 (2000), allowed Yakima County to impose ad valorum taxes on reservation land pursuant to the General Allotment Act. *Id*. at 270.

In *Lundgren* our court stated that in *Yakima*, the United States Supreme Court reached its holding by characterizing the county's assertion of jurisdiction over the land as in rem, rather than in personam jurisdiction over Yakama Nation. 187 Wn.2d at 866. The court further noted that Washington courts had similarly upheld a superior court's assertion of in rem jurisdiction over tribally owned land in *Anderson & Middleton Lumber Co. v. Quinault Indian Nation*, 130 Wn.2d 862, 929 P.2d 379 (1996), and *Smale v. Noretep*, 150 Wn. App. 476, 208 P.3d 1180 (2009). *Lundgren*, 187 Wn.2d at 866-76.

In *Anderson*, this court held that the Grays Harbor County Superior Court had in rem jurisdiction over an action in partition and quiet title to fee-patented lands within the Quinault Indian Reservation. 130 Wn.2d at 873-74. The *Anderson* court relied heavily on the *Yakima* case, stating that the court was exercising jurisdiction over the property, not over the Quinault Indian Nation, and thus the land was "subject to a state court in rem action which does nothing more than divide it among its legal owners according to their relative interests." *Id*. at 873.

In *Smale*, the Smales sought to quiet title to property they claimed to have acquired through adverse possession against Noretep, the non-Indian original owner. 150 Wn. App. at 476-77. After the Smales sued, Noretep sold the property by statutory

9

warranty deed to the Stillaguamish Tribe. *Id*. Smales added the Tribe as a defendant. *Id*. The Tribe argued that sovereign immunity barred the action. *Id*. In holding that sovereign immunity did not bar the Tribe from being joined in the action, the court relied heavily on *Anderson*, stating, "The quiet title action in *Anderson* is similar to the quiet title action here in two crucial ways: both are proceedings in rem to determine rights in the property at issue and neither has the potential to deprive any party of land they rightfully own." *Id*. at 483. Since the Smales allegedly acquired title to the land via adverse possession before the original owner sold the land to the Tribe, the court reasoned that the Tribe never possessed the land and never had land to lose. *Id*. at 480-81. The court found that the holding in *Anderson* controlled the case before it. *Id*. at 478.

In *Lundgren* our court held that *Yakima*, *Anderson*, and *Smale* "establish the principle that our superior courts have subject matter jurisdiction over in rem proceedings in certain situations where claims of sovereign immunity are asserted." 187 Wn.2d at 868. However, *Lundgren* was vacated by the United States Supreme Court in *Upper Skagit*, 584 U.S. 554, and remanded to our court. Specifically, the United States Supreme Court in *Upper Skagit* stated that it had accepted review to clarify that its decision in *Yakima* did not address the scope of tribal sovereign immunity but, rather, a question of statutory interpretation of the Indian General Allotment Act of 1887. *Id*. at 558. "*Yakima* sought only to interpret a relic of a statute in light of a distinguishable precedent; it resolved nothing about the law of sovereign immunity." *Id*. at 559. The Lundgrens asked the United States Supreme Court to affirm the judgment based on an alternative

ground: that sovereigns enjoy no immunity from actions involving immovable property located in the territory of another sovereign. *Id*. at 559-60. Exercising judicial restraint, the Court stated, "We leave it to the Washington Supreme Court to address these arguments in the first instance." *Id*. at 560.

Flying T argues that the holdings in *Lundgren*, *Anderson*, and *Smale* are still controlling since they contain independent rationales aside from their reliance on *Yakima*. Flying T contends that the holding in *Anderson* is still good law and must be followed under stare decisis principles. It also argues that *Smale* presented two crucial bases for jurisdiction: in rem, which relied on *Yakima*, and prior ripened adverse possession.[3]

Adverse possession is based in both statutory and common law. Flying T claims that due to the unique nature of adverse possession law, once the elements thereof have been met, original title vests without the need for court action. Therefore, contrary to the Court of Appeals' holding, there is no need for Congress to act to resolve such in rem adverse possession cases. In addition to *Smale* and *Anderson*, Flying T cites to *Gorman*

---

[3] The Tribe states that Flying T's new argument that prior ripened adverse possession is an exception to sovereign immunity, was not presented below and should not be heard. Although Flying T mainly argued the immovable property doctrine is an exception to tribal sovereign immunity below, it also discussed the unique nature of adverse possession law, therefore, we consider its argument. The Tribe also notes that Flying T raises another new argument that "[t]his is a fn.8 case appropriate for the Courts." Pet. for Rev. at 5-6. This refers to footnote 8 in *Bay Mills*, 572 U.S. 799 n.8, which states that courts have not addressed whether immunity should apply when "a tort victim, or other plaintiff who has not chosen to deal with a tribe, has no alternative way to obtain relief for off-reservation commercial conduct." The court noted that the argument of whether there is a "'special justification'" for abandoning precedent in such circumstances was not before it. *Id*. (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212, 104 S. Ct. 2305, 81 L. Ed. 2d 164 (1984)) This new argument about lack of alternative remedies potentially being a reason not to abide by precedent was not raised below, and we have discretion not to consider it. *State v. Lazcano*, 188 Wn. App. 338, 361, 354 P.3d 233 (2015).

11

*v. City of Woodinville*, 175 Wn.2d 68, 283 P.3d 1082 (2012), to support his argument that here, the Tribe cannot lose land that it did not rightfully own, having been adversely possessed prior to its acquisition by the Tribe.

In *Gorman*, the plaintiff sought to acquire title to land that had been dedicated to the city of Woodinville. 175 Wn.2d at 70-71. Under RCW 4.92.010, Washington waived its own immunity, allowing a right of action against it in superior court. However, it had limited this waiver under RCW 4.16.160, which stated that the statute of limitations for adverse possession would not run against the State or a city acting in its governmental capacity. The court held that RCW 4.16.160 could not shield the city under the facts of the case since the statute of limitations ran while the land was privately owned before the land was dedicated to the city. *Id*. at 74.

Similarly, in *Burlison v. United States*, 533 F.3d 419, 421 (6th Cir. 2008), the plaintiffs sought to quiet title to an access road pursuant to the Quiet Title Act (QTA). *See* 28 U.S.C. § 2409a. The QTA provides that "[t]he United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." *Id*. § 2409 a(a). The QTA states that "[n]othing in this section shall be construed to permit suits against the United States based upon adverse possession." *Id*. § 2409a(n). The plaintiffs argued that the QTA did not foreclose adverse possession claims that ripened before the government acquired title to the lands. *Burlison*, 533 F.3d at 428. The court found the argument to be cognizable

12

but did not answer the question since the plaintiffs failed to meet their burden of proving adverse possession. *Id*.

Neither *Gorman* nor *Burlison* discussed the limits of common law sovereign immunity or involved tribes. *Gorman* was interpreting a state statute and *Burlison* focused on the QTA. Furthermore, both Washington and the United States have waived their immunity by allowing a cause of action to be brought against them in court related to real property. In contrast, the Tribe has not waived its own immunity and the statutes discussed in the cases above do not apply. Indeed, the fact that both Washington and the United States explicitly waived immunity suggests that such explicit waiver from the Tribe might similarly be necessary.

Even if we interpret *Smale* as providing two different rationales for its holding, one being that the Smales acquired title to the land through adverse possession before the Tribe was deeded the land, it was not sufficiently analyzed to support such a holding here. The court cited only one Idaho Supreme Court case, which did not deal with tribes, in support of the proposition that parties seeking to quiet title to land they allegedly own are not asserting claims against a sovereign. *See Lyon v. State*, 76 Idaho 374, 376, 283 P.2d 1105 (1955). Other cases specifically discussing tribes hold that tribal sovereign immunity is not waived with respect to real property. *See Cayuga Indian Nation v. Seneca County*, 761 F.3d 218, 221 (2d Cir. 2014) (declining to draw a distinction between in rem and in personam proceedings); *Oneida Indian Nation v. Madison County*, 605 F.3d 149, 157 (2d Cir. 2010) (a tribe's immunity from suit is independent of its

lands), *vacated and remanded*, 562 U.S. 42, 131 S. Ct. 704, 178 L. Ed. 2d 587 (2011); *Hamaatsa, Inc. v. Pueblo of San Felipe*, 2017-NM-007, 388 P.3d 977, 985 (2016) (regardless of whether claims are in rem or in personam, tribes still retain their sovereign immunity).

Flying T states that original title to real property vests once the elements of adverse possession are met. He cites *Gorman*; however, as previously noted, the facts in *Gorman* are distinguishable. The State had waived its immunity to suit and limited that waiver by providing that "'[n]o claim of right *predicated upon the lapse of time* shall ever be asserted against the state.'" *Gorman*, 175 Wn.2d at 70 (emphasis added) (quoting RCW 4.16.160). The court in *Gorman* stated that the statute barred claims that were "'predicated upon the lapse of time,'" however, Gorman's claim was that "the requisite period of time *already ran* against the private owner." *Id*. at 73. Therefore, the claim was not barred by the statute. Furthermore, the court stated that the city was the proper defendant as the current record titleholder of the disputed property. Here, the Tribe is the record titleholder to the disputed property and thus an interested party.

To formally establish that real property has been adversely possessed, a quiet title action is usually initiated, as is the case here. A court must have subject matter jurisdiction to decide a quiet title action against a tribe. Tribal sovereign immunity is an issue of subject matter jurisdiction. *See Lewis v. Norton*, 424 F.3d 959, 963 (9th Cir. 2005) (holding that the tribe was immune from suit and therefore affirming the lower court's dismissal of the case for lack of subject matter jurisdiction); *Acres Bonusing, Inc*.

*v. Marston*, 17 F.4th 901, 908 (9th Cir. 2021) ("when a defendant timely and successfully invokes tribal sovereign immunity, we lack subject matter jurisdiction"); *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1015-16 (9th Cir. 2007) ("Sovereign immunity limits a federal court's subject matter jurisdiction over actions brought against a sovereign. Similarly, tribal immunity precludes subject matter jurisdiction in an action against an Indian tribe." (citation omitted)).

Thus, even if Flying T asserts the court has in rem jurisdiction, it still must show some authority vesting our courts with subject matter jurisdiction over quiet title actions against tribes. In rem jurisdiction grants courts authority to deal with land within its boundaries, however, jurisdiction over real property does not waive tribal sovereign immunity. Only Congress may abrogate tribal immunity; alternatively, a tribe may waive its immunity in "'clear' and unmistakable terms." *Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1016 (9th Cir. 2016) (quoting *C&L Enters.*, 532 U.S. at 418).

We hold that Washington and federal case law does not support finding in rem jurisdiction over land owned by tribes to determine if there is a viable adverse possession claim.

*The Immovable Property Doctrine*

Flying T argues that the common law immovable property exception to foreign sovereign immunity applies to tribes acquiring off-reservation land, despite Congress not expressly or unequivocally waiving tribal immunity in such instances.

Prior to the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. §§ 1602-1611, immunity for foreign nations was based on common law and primarily centered around deference to the political branches of government. Our nation's history illustrates that our common law foreign sovereign immunity was a matter of comity. *Verlinden BV v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983) ("foreign sovereign immunity is a matter of grace and comity on the part of the United States"). Rather than assuming jurisdiction, the United States Supreme Court would defer to the political branches, specifically the executive branch, to determine whether to take jurisdiction over actions against foreign sovereigns. *Id*. The United States Department of State ordinarily requested immunity in all actions against friendly foreign sovereigns. *Id*. For example, in *Knocklong Corp. v. Kingdom of Afghanistan*, 6 Misc. 2d 700, 167 N.Y.S.2d 285 (County Ct. 1957), the Kingdom of Afghanistan acquired fee ownership of real property in New York. Since the property was being used to house the Chief Representative of Afghanistan to the United Nations, the State Department urged the New York state court to find that foreign sovereign immunity barred the action. *Id*. at 701.

In 1952, the State Department through the "Tate Letter" attempted to remove the discretionary application of sovereign immunity. *Verlinden BV*, 461 U.S. at 487 (citing Letter from Jack B. Tate, Acting Legal Advisor, U.S. Dep't of State, to Acting U.S. Att'y Gen. Phillip B. Perlman (May 19, 1952)). It announced that it would be adopting a more "'restrictive' theory" of sovereign immunity, which confined immunity to suits involving

a foreign sovereign's public acts but not extending it to cases "arising out of a foreign state's strictly commercial acts." *Id*.

In 1976, Congress passed the FSIA to attempt to alleviate case-by-case diplomatic pressures. *Id*. at 488. The FSIA mainly codified the restrictive theory of sovereign immunity. However, Congress carved out an exception to foreign sovereign immunity in 28 U.S.C. § 1605(a)(4), which states, "A *foreign state* shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which . . . rights in immovable property situated in the United States are in issue." (Emphasis added.) The parties in this case agree that the FSIA, and its exceptions, do not extend to tribes.

While Flying T agrees that the FSIA does not apply to tribes, it argues that a common law immovable property exception exists, predating the FSIA, and applies to tribes. Flying T states that we should focus on the "product" of the political branches' decisions on foreign sovereign immunity, meaning the patterns emerging from the collection of individual decisions over time, to define the scope of tribal immunity in the context of non-reservation title to real property. Suppl. Br. of Pet'r Flying T Ranch at 15. That product, it contends, includes the immovable property exception, which limits the scope of tribal immunity. It asserts that Congress has taken no action to remove the immovable property exception and, therefore, it should continue to apply to tribes on off-reservation land. Flying T's argument attempts to shift the burden, urging this immovable property exception applies unless Congress later says otherwise. This is not

17

how tribal sovereign immunity works. Tribal sovereign immunity applies unless Congress takes action stating otherwise.

Moreover, Flying T argues, territorial sovereigns have a primeval interest in resolving title disputes within their own domain. However, as previously discussed, before the FSIA, foreign national immunity was almost entirely determined by the executive branch. Thus, foreign nations could have acquired land within another state, claimed immunity, and been granted that immunity upon the recommendation of the State Department, not based on preferences of the state in which the property was located.

For support, Flying T cites to cases that do not involve tribes, such as *Asociacion de Reclamantes v. United Mexican States*, 237 U.S. App. D.C. 81, 735 F.2d 1517, 1521-22 (1984), and *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199-200, 127 S. Ct. 2352, 168 L. Ed 2d 85 (2007). In *Permanent Mission of India*, the court held that the FSIA does not immunize a foreign government from suit to declare the validity of tax liens on property held by the sovereign for purposes of housing its employees. 551 U.S. at 195. The court reasoned that the purpose of the FSIA was to find immunity only with respect to public acts of a state, but not with respect to private acts of a sovereign. *Id*. at 199. Additionally, the FSIA was meant to codify the real property exception recognized by international practice. *Id*. at 200; *see Asociacion de Reclamantes,* 735 F.2d at 1521 (recognizing that a territorial sovereign has a primeval interest in resolving all disputes over the use of real property in its own domain).

The flaw here is that the FSIA was not a codification of the common practice within American courts but rather was meant to codify the real property exception as recognized by *international practice*. Prior to the FSIA and the Tate Letter, our common practice was to defer to the State Department regarding whether to find that there was immunity with respect to a foreign nation.

The Court in *The Schooner Exchange* recognized the common law immovable property exception in its first acknowledgment of foreign sovereign immunity. The case involved an American claimant asserting title to a national armed vessel that was commissioned by and in service of the emperor of France. *The Schooner Exch. v. M'Faddon*, 11 U.S. (7 Cranch) 116, 146, 3 L. Ed. 287 (1812). The Court stated, "A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction . . . and assuming the character of a private individual." *Id*. at 145; *see also Georgia v. City of Chattanooga*, 264 U.S. 472, 479-80, 44 S. Ct. 369, 68 L. Ed. 796 (1924) (rejecting Georgia's claim of sovereign immunity over the land because it had "acquired land in another State for the purpose of using it in a private capacity"). While there is little case law discussing or applying the common law immovable property exception, these cases suggest that the purpose for which the property is being used is a consideration in applying the common law exception to sovereign immunity.

Assuming the use to which the subject property is put is germane, the Tribe here used state and federal funding from a conservation grant from the National Oceanic and

Atmospheric Administration, through the Washington State Recreation and Conservation Office, to purchase the land. This was conditioned on the Tribe protecting the land in perpetuity with a deed of right for salmon recovery. The Tribe is expected to take reasonable and feasible measures to protect, preserve, restore, and/or enhance the habitat functions on the property, which aim to support Puget Sound chinook, chum, coho, and pink salmon, and steelhead, cutthroat, and bull trout. Salmon in the Stillaguamish River are a keystone species that are essential for the continuation of the Tribe's living culture. As salmon runs in the Stillaguamish River face extinction, so do many aspects of the Tribe's culture, community, and treaty reserved rights. After acquiring the land, the Tribe designated it as conservation land as a way to preserve their way of life and protect and restore salmon in the Stillaguamish River.

Protecting the riparian habitat necessary for salmon is tightly connected to the Tribe's treaty right to fish. Although the land at issue is not part of a reservation, its purchase is conditioned on the Tribe agreeing to use the land for salmon recovery purposes. Thus, the land is being used to promote the interests of the Tribe as a whole, especially with respect to preserving their treaty rights to fish, as well as the public by helping restore salmon populations. *See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991) (stating that the test for determining whether land is Indian country does not turn upon whether that land is denominated "'trust land'" or "'reservation'" but, rather, "whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the

20

Government'" (quoting *United States v. John*, 437 U.S. 634, 648-49, 98 S. Ct. 2541, 57 L. Ed. 2d 489 (1978))). It is unlikely Congress would have intended to waive tribal sovereign immunity in these circumstances where the Tribe has used federal funding to acquire the land and is using the land for a specified purpose subject to the State's supervision.

More fundamentally, the immovable property exception discussed above has never been applied in the context of Indian tribes, and Flying T has not persuaded us that it is appropriate for the judicial branch to do so now. The immovable property exception is a doctrine that primarily emerged in the context of *foreign* sovereign immunity. But tribes are not foreign nations; the United States Supreme Court has described tribes as "domestic dependent nations" with a unique relationship to the federal government. *Cherokee Nation*, 30 U.S. at 13. Thus, the scope of sovereign immunity has never been coextensive between tribes, states, and foreign nations. Instead, as stated above, in the absence of a tribe's waiver of immunity, courts defer to Congress, which must "unequivocally" express its decision to abrogate tribal immunity. *Bay Mills*, 572 U.S. at 790. To this point, it is relevant that when Congress enacted the FSIA, it did not expressly include the tribes, suggesting it did not intend the immovable property exception, whether in the FSIA or common law, to apply to tribes.

In support of its position, Flying T cites to Chief Justice Roberts' concurrence in *Upper Skagit* to indicate that the Court believed that an immovable property exception should apply to tribes. "There should be a means of resolving a mundane dispute over

21

property ownership, even when one of the parties to the dispute—involving non-trust, non-reservation land—is an Indian tribe. The correct answer cannot be that the tribe always wins no matter what." *Upper Skagit*, 584 U.S. at 562 (Roberts, C.J., concurring).[4] However, even Flying T acknowledges that finding such an exception would be contrary to the primary holdings and rationales in *Kiowa* and *Bay Mills*, which upheld tribal immunity in off-reservation commercial business dealings.

In *Kiowa*, the Court helped clarify the bounds of tribal sovereign immunity. 523 U.S. 751. The Kiowa Tribe had agreed to buy stock from a company, and a tribal representative signed a promissory note in the name of the tribe. *Id*. at 753. A disputed issue was whether the note was signed on or off tribal trust land. *Id*. at 753-54. The tribe defaulted on the note and an action was brought in state court. *Id*. at 754. The Court held that the tribe was entitled to sovereign immunity from suit, regardless of where the note was signed and that sovereign immunity extended to the tribe's commercial activities. *Id*. at 754-55. It reasoned that precedent did not support finding a distinction between governmental and commercial activities. *Id*. at 755. In coming to its decision that tribal sovereign immunity applied, the Court reasoned that Congress has not acted to abrogate sovereign immunity and that Congress is in the best position "to weigh and accommodate the competing policy concerns and reliance interests." *Id*. at 757, 759. Therefore, the

---

[4] Flying T also argues that requiring Congress to act first will lead to untenable and absurd results. However, we are bound by precedent. Moreover, Congress has acted to waive tribal immunity in more than one instance; therefore, it is not absurd for Congress to act here.

Court declined to revisit current case law on tribal sovereign immunity and chose to defer to Congress. *Id*. at 760.

In *Bay Mills*, the Court further clarified that tribal immunity is the baseline. 572 U.S. at 790. If Congress intends to abrogate such immunity, it must do so unequivocally. *Id*.; *see Santa Clara Pueblo*, 436 U.S. at 58 (a waiver of sovereign immunity cannot be implied, but must be unequivocally expressed). "Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. The State of Michigan had brought an action to enjoin the Bay Mills Indian Tribe from operating a casino on land outside of its reservation. The Court held that the State lacked the ability to sue the tribe for illegal gaming, even if occurring off the reservation. *Id*. at 795. In reaching that conclusion, the Court reasoned that as domestic dependent nations, tribes exercise sovereignty at the will of the federal government and that means tribes are immune from lawsuits unless Congress wishes to abrogate that immunity. *Id*. at 803. Congress had not abrogated that immunity under the Indian Gaming Regulatory Act with respect to off-reservation gaming: thus, Michigan could not sue the Tribe to enjoin the casino. *Id*. at 804.

Congress has chosen to limit tribal sovereign immunity in specific contexts through explicit statutory provisions. *See, e.g.*, 25 U.S.C. § 2710(d)(7)(A)(ii) (abrogating tribal immunity in the context of class III gaming activities); 25 U.S.C. § 450f(c)(3) (relating to mandatory liability insurance). Courts have also found that Congress has

23

waived tribal sovereign immunity when it has included Indian Tribes within its definition of "persons" within a national regulatory scheme. *See United States v. Weddell*, 12 F. Supp. 2d 999 (D.S.D. 1998), *aff'd*, 187 F.3d 645 (8th Cir. 1999) (congressional abrogation under 28 U.S.C. §§ 3001-3008, also known as the Federal Debt Collection Act, by virtue of its inclusion of Indian tribes under the definition of "person[s]" who may be garnishees); *Osage Tribal Council ex rel. Osage Tribe of Indians v. U.S. Dep't of Lab.*, 187 F.3d 1174, 1182 (10th Cir. 1999) (Congress abrogated tribal sovereign immunity in the Safe Drinking Water Act); *see also Pub. Serv. Co. of Colorado v. Shoshone-Bannock Tribes*, 30 F.3d 1203 (9th Cir. 1994) (holding that tribes are subject to suit under the preemption provision of the Hazardous Materials Transportation Act since the provision specifically refers to tribes). When it has done so, it has typically, but not always, referenced tribes explicitly. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 395, 143 S. Ct. 1689, 216 L. Ed. 2d 342 (2023) (holding that the Bankruptcy Code unequivocally abrogated tribal sovereign immunity when it abrogated sovereign immunity for "other foreign or domestic government[s]").

Despite Washington's primeval interests in resolving disputes over land within its own boundaries, Congress has not unequivocally abrogated tribal sovereign immunity with respect to nonreservation property acquired by tribes. The parties agree that FSIA and its exception do not apply to tribes, and the common law immovable property exception has never been applied in the context of Indian tribes, which are domestic

24

dependent nations.  Furthermore, as the Supreme Court noted in *Santa Clara Pueblo*, *Kiowa*, and *Bay Mills*, the waiver of tribal sovereign immunity will not be inferred but must be unequivocal.  We hold that a common law immovable property exception to sovereign immunity does not apply here.

*The Superior Court's Dismissal of Flying T's Claims*

Flying T argues that the superior court erred in dismissing its case under CR 19 since the Tribe is not an indispensable party.  CR 19(a) requires the joinder of necessary parties.  However, as the Tribe notes, the superior court dismissed the case based on CR 12(b)(1)-(3), (6), and (7).  Since we hold that the superior court properly dismissed the case based on, among other things, lack of subject matter jurisdiction, we do not reach this argument.

CONCLUSION

Federal common law has long established that tribes are immune from suit and may be sued only where a tribe waives its immunity or when Congress has unequivocally abrogated immunity.  While the superior court has in rem jurisdiction over real property, it does not have subject matter jurisdiction over adverse possession claims involving nonreservation land owned by tribes.

Furthermore, a common law immovable property exception has never been applied to waive tribal sovereign immunity.  An act of Congress is necessary to create such an exception to tribal sovereign immunity.

We hold that state courts do not have subject matter jurisdiction over adverse possession claims related to nonreservation land owned by tribes and that the common law immovable property exception does not apply to tribes.

Accordingly, we affirm the Court of Appeals.

_____
Madsen, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Johnson, J.

_____
González, J.

_____
Gordon McCloud, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

*Flying T Ranch, Inc., v. Stillaguamish*

No. 103430-0

MUNGIA, J. (concurring)—I concur with the majority's opinion.[1]  And yet I

dissent.  Not from the majority's opinion, but I dissent from the racism embedded in the

federal case law that applies to this dispute.

FEDERAL INDIAN LAW IS A PRODUCT OF THE RACIST BELIEFS ENDEMIC IN OUR SOCIETY
AND OUR LEGAL SYSTEM

While it is certainly necessary to follow federal case law on issues involving

Native American tribes and their members, at the same time it is important to call out that

the very foundations of those opinions were based on racism and white supremacy.  By

doing this, readers of our opinions will have no doubt that the current court disavows, and

condemns, those racist sentiments, beliefs, and statements.

---

[1] The majority assumes, for the sake of argument, that the use the Stillaguamish Tribe makes of the property at issue is germane to its analysis.  It analyzes whether the Tribe uses the property for private or public use under the immovable property exception and suggests that the use is public.

In my view, this analysis is irrelevant to the outcome of the case.  As domestic sovereign nations, the immovable property exception does not apply to tribes *regardless* of what a tribe uses the property for.  I depart from the majority to the extent that the opinion may suggest a narrower holding.

Since the founding of our country, the federal government has characterized Native Americans as "savages": They were "uncivilized." They had little claim to the land upon which they lived. At times, the federal government attempted to eradicate Native Americans through genocidal policies. At other times, the federal government employed ethnic cleansing by forcibly removing children from their parents' homes to strip them from their culture, their language, and their beings.[2]

Federal Indian case law arises from those racist underpinnings.

The majority correctly cites to *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L. Ed. 25 (1831), which is one of the foundational cases involving tribal sovereignty. That opinion is rife with racist attitudes toward Native Americans. Chief Justice John Marshall, writing for the majority, describes a tribe's relationship to the federal government as one of "ward to his guardian." *Id.* at 17. In effect, the opinion presents tribal members as children, and the federal government as the adult. That theme would follow in later opinions by the United States Supreme Court—as would the theme of white supremacy.

*Cherokee Nation* began with the premise that Native American tribes, once strong and powerful, were no match for the white race and so found themselves "gradually sinking beneath our superior policy, our arts and our arms." *Id*. at 15. The white man was considered the teacher, the Native Americans the pupils:

---

[2] For a description of the federal government's treatment of Native Americans from the founding through the early 1970s, see *In re Dependency of G.J.A.*, 197 Wn.2d 868, 884-85, 489 P.3d 631 (2021).

> Meanwhile they are in a state of pupilage. Their relation to the United
> States resembles that of a ward to his guardian.

*Id*. at 17.

This characterization of superior to inferior, teacher to student, guardian to ward, was repeated in later United States Supreme Court opinions.

In *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S. Ct. 216, 47 L. Ed. 299 (1903), often characterized as the "American Indian *Dred Scott*,"[3] the Court used that rationale to justify ruling that the United States could break its treaties with Native American tribes.

> These Indian tribes *are* the wards of the nation. They are communities
> *dependent* on the United States. Dependent largely for their daily food.
> Dependent for their political rights. . . . From their very weakness and
> helplessness . . . there arises the duty of protection, and with it the power.

*Id*. at 567 (quoting *United States v. Kagama*, 118 U.S. 375, 383-84, 6 S. Ct. 1109, 30 L. Ed. 228 (1886)).

Our court also carries the shame of denigrating Native Americans by using that same characterization: "The Indian was a child, and a dangerous child, of nature, to be both protected and restrained." *State v. Towessnute,* 89 Wash. 478, 482, 154 P. 805 (1916), *judgment vacated and opinion repudiated by* 197 Wn.2d 574, 486 P.3d 111 (2020).

---

[3] *See* Adam Crepelle, *Lies, Damn Lies, and Federal Indian Law: The Ethics of Citing Racist Precedent in Contemporary Federal Indian Law*, 44 N.Y.U. REV. L. & SOC. CHANGE 529, 530 (2021); Philip P. Frickey, *Doctrine, Context, Institutional Relationships, and Commentary: The Malaise of Federal Indian Law Through the Lens of* Lone Wolf, 38 TULSA L. REV. 5, 5 (2002).

Returning to *Cherokee Nation*, Justice William Johnson's separate opinion was less tempered in how he considered the various Native American tribes:

> I cannot but think that there are strong reasons for doubting the applicability of the epithet *state*, to a people so low in the grade of organized society as our Indian tribes most generally are.

*Cherokee Nation*, 30 U.S. at 21. Native Americans were not to be treated as "equals to equals" but, instead, the United States was the conqueror and Native Americans the conquered. *Id*. at 23.

In discussing Native Americans, Justice Johnson employed another racist trope used by judges both before and after him: Native Americans were uncivilized savages.

> [W]e have extended to them the means and inducement to become agricultural and civilized. . . . Independently of the general influence of humanity, these people were restless, warlike, and signally cruel.
>
> . . . .
>
> But I think it very clear that the constitution neither speaks of them as states or foreign states, but as just what they were, Indian tribes . . . which the law of nations would regard as nothing more than wandering hordes, held together only by ties of blood and habit, and having neither laws or government, beyond what is required in a savage state.

*Id*. at 23, 27-28.

This same characterization was used by Justice Stanley Matthews in *Ex parte Kan-Gi-Shun-Ca (otherwise known as Crow Dog)*, 109 U.S. 556, 3 S. Ct. 396, 27 L. Ed. 1030 (1883). Justice Matthews described Native Americans as leading a savage life. They were people who did not have "the responsibilities of civil conduct." *Id.* at 571. Native Americans in fact were incapable of comprehending civility. *Id.* To Justice Matthews,

there was a clear distinction between Native Americans and the white man. In comparing

tribal courts to the white man's court, he stated that tribal courts have

> [T]he strongest prejudices of their savage nature; one which measures the
> red man's revenge by the maxims of the white man's morality.

*Id*. at 571.

One other aspect of Justice Johnson's opinion in *Cherokee Nation* that must be

noted and condemned is the "Doctrine of Discovery." Justice Johnson wrote:

> When the eastern coast of this continent, and especially the part we inhabit,
> was discovered, finding it occupied by a race of hunters, connected in
> society by scarcely a semblance of organic government; the right was
> extended to the absolute appropriation of the territory, the annexation of it
> to the domain of the discoverer. It cannot be questioned that the right of
> sovereignty, as well as soil, was notoriously asserted and exercised by the
> European discoverers. From that source we derive our rights, and there is
> not an instance of a cession of land from an Indian nation, in which the
> right of sovereignty is mentioned as part of the matter ceded.

*Cherokee Nation*, 30 U.S. at 23.

In *Johnson v. M'Intosh*, 21 U.S. 543 (8 Wheat.), 5 L. Ed. 681 (1823), the United

States Supreme Court recognized the Doctrine of Discovery. The doctrine provided the

justification for European nations to claim title to certain lands "'then unknown to all

Christian people.'"[4] *Id.* at 576. Chief Justice Marshall, writing for the majority, stated

that while European countries may have legitimate claims to various parts of the United

States, Native Americans retained only a right of occupancy to the land, which was

subject to the conquering nation's right of appropriation. *Id*. at 574, 584.

---

[4] For a description of the doctrine and its origins, see *State v. Wallahee*, 3 Wn.3d 179, 181 &
n. 1, 548 P.3d 200 (2024).

Our court was guilty of adopting that mistaken ideology:

> The premise of Indian sovereignty we reject. The treaty is not to be interpreted in that light. At no time did our ancestors in getting title to this continent, ever regard the aborigines as other than mere occupants, and incompetent occupants, of the soil. Any title that could be had from them was always disdained. From France, from Spain, from Mexico, and from England we have ever proclaimed our title by purchase, by conquest, and by cession, in all of which great transactions the migratory occupant was ignored. Only that title was esteemed which came from white men, and the rights of these have always been ascribed by the highest authority to lawful discovery of lands, occupied, to be sure, but not owned, by any one before. *Johnson v. McIntosh*, [21 U.S. ]8 Wheat. 543[, 5 L. Ed. 681 (1823)]. If in *Worcester v. Georgia*, [31 U.S. ]6 Pet. 515[, 8 L. Ed. 483 (1832)], the supreme court speaks of the Indians having something which the whites had yet to purchase, it was not title, but mere possessory uses for subsistence. Later cases continue to plant our title on discovery. *Martin v.* [*Lessee of*] *Waddell*, [41 U.S. ]16 Pet. 367, 409[, 10 L. Ed. 997 (1842)]; *United States v. Rogers*, [45 U.S. ]4 How. 567, 572[, 11 L. Ed. 1105 (1846)].

*Towessnute*, 89 Wash. at 481-82.

In short, European nations gained title to the land without ever setting foot on the land itself. Viewing the land from the ship was enough to give them title. The Doctrine of Discovery allowed Europeans to justify driving Native Americans from their homes and from their lands because the federal government, as conquerors, had the right to extinguish Indian title.

The tribes did not own the land but merely occupied it. They were not sovereigns in relation to the federal government. The United States controlled the land, and the sovereignty, of the various tribes.

The cases the majority cites, and indeed must cite, are based on the racist premises that Native American tribes were never sovereign nations, that they had no fee title to the

land on which they lived, and that the United States had the ultimate power as to those issues. The justification for those holdings was that Native Americans were inferior and were savages, who became wards of the United States.

Each time a court cites a case that has as its foundation such racist fallacies, it is incumbent on us to call out that racism, even if just in a footnote.

### THE UNITED STATES SUPREME COURT, AND OUR COURT, HAS TAKEN STEPS TO ADDRESS THESE PAST WRONGFUL ACTIONS

The United States Supreme Court, and our court, has taken steps to address some of the errors of the past.

The United States Supreme Court now recognizes "the sovereign authority of Native American Tribes and their right to 'the common-law immunity from suit traditionally enjoyed by sovereign powers.'" *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 557, 138 S. Ct. 1649, 200 L. Ed. 2d 931 (2018) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788, 134 S. Ct. 2024, 188 L. Ed. 2d 1071 (2014)); *see also Haaland v. Brackeen*, 599 U.S. 255, 276, 143 S. Ct. 1609, 216 L. Ed. 2d 254 (2023) (while Congress's Indian affairs power "is plenary within its sphere, … even a sizeable sphere has borders").

In this opinion, our court correctly holds that the Stillaguamish Tribe has sovereign immunity and that "only Congress and the tribes themselves retain the power to determine when tribal immunity may be waived. " Majority at 7.

In recent years we have repudiated prior decisions that disregarded the rights of Native Americans and their treaty rights. In *Towessnute*, 197 Wn.2d at 577-78, we

7

repudiated the prior *Towessnute* "case; its language; its conclusions; and its

mischaracterization of the Yakama people." In *State v. Wallahee*, 3 Wn.3d 179, 187-88,

548 P.3d 200 (2024), we recalled the mandate and vacated the wrongful conviction of

Jim Wallahee,[5] who had been convicted for exercising his treaty right to hunt on ceded

Yakama land. We also properly called out the wrongfulness of the Doctrine of

Discovery:

> The Doctrine of Discovery and its use in law to justify state-sponsored
> violence are a stain on this nation.

*Id*. at 189.

In those prior, repudiated decisions, we had followed United States Supreme Court

precedent that Native American tribes were not sovereign entities and that Native

Americans were merely occupants of the land. While we continue to be constrained to

follow United States Supreme Court precedent, we must not be constrained from calling

out the racism found within those opinions. We must do a better job.

CONCLUSION

In our letter dated June 4, 2020, we noted the "devaluation and degradation of

[B]lack lives is not a recent event."[6]

The same holds true for Native Americans.

---

[5] *State v. Wallahee*, 143 Wash. 117, 255 P. 94 (1927).
[6] Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (Wash. June 4, 2020)
https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%2006042020.pdf [https://perma.cc/QNT4-H5P7].

8

We noted, "The legal community must recognize that we all bear responsibility for this on-going injustice, and that we are capable of taking steps to address it, if only we have the courage and the will."[7]

The same holds true for Native Americans.

We noted, "As judges, we must recognize the role we have played in devaluing [B]lack lives."[8]

The same is true for Native Americans.

While we are bound by United States Supreme Court precedent, we are not bound to stay silent as to the underlying racism and prejudices that are woven into the very fabric of those opinions.  Instead, every chance we get, we must clearly, loudly, and unequivocally state that was "wrong."

That was wrong.

_____
Mungia, J.

---

[7] *Id*.
[8] *Id*.