**FILED**
**DECEMBER 16, 2025**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40388-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RYAN LEWIS FARR, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — In 2012, the State charged Ryan Farr with assault in the first degree. In 2013, after multiple competency evaluations, the trial court accepted Farr's plea of not guilty by reason of insanity (NGRI). In 2024, perhaps because he remains institutionalized, Farr appealed his NGRI plea. We granted an enlargement of time because the State failed to establish Farr was advised of his right to appeal at the 2013 plea hearing.

On appeal, Farr argues his NGRI was not knowing, intelligent and voluntary because, among other reasons, he was not advised that he had the right to remain silent just prior to his plea. The State raises multiple arguments why this court should either dismiss Farr's appeal or affirm the NGRI plea.

We dismiss Farr's direct appeal because Farr had previously filed a direct appeal and agreed to dismiss it. Although Farr's first appellate counsel did not accompany the request for dismissal with a written statement from Farr reflecting his agreement, the

record is more than sufficient to reasonably infer that Farr agreed to dismiss his first appeal. We therefore dismiss this, Farr's second direct appeal, and do not reach the other issues raised by the parties.

## FACTS

In 2012, Farr punched and repeatedly stabbed a woman outside a restaurant. The attack was recorded on a nearby security video camera. The State charged Farr with assault in the first degree. The information accompanying the charge contained the elements of first degree assault: "RYAN LEWIS FARR, in the County of Walla Walla, State of Washington, on or about the 21st day of September, 2012, with intent to inflict great bodily harm upon the person of VENITA JACKSON, did assault such person with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." Clerks Papers (CP) at 6.

*First competency evaluation*

On October 8, 2012, the trial court, upon a motion by Farr's counsel, ordered Eastern State Hospital (ESH) to conduct a sanity and competency evaluation. Dr. Nathan Henry, on behalf of ESH, performed the evaluation two weeks later. During the interview, Farr informed Dr. Henry he had a history of auditory hallucinations. Dr. Henry noted there were a couple of instances when it appeared that Farr may have been

distracted by auditory hallucinations. Farr also alluded to possible paranoid delusions about continued persecution experiences.

During the competency portion of the interview, Dr. Henry evaluated Farr on four factors: his ability to consult with counsel, his factual understanding of the courtroom proceedings, his rational understanding of the courtroom proceedings, and his overall rational ability. Dr. Henry found Farr's capacity to establish and maintain a working relationship with his attorney was normal and evidenced little competency-related impairment. Farr also responded positively to interactions with his attorney.

Dr. Henry believed Farr had an adequate understanding of courtroom procedures and elements of a pending trial even though he had antisocial attitudes about the legal system and possible delusional beliefs. "Farr knew that he [was] being charged with . . . First Degree Assault, . . . knew that his charge[ was a felony] and knew that a felony [was] more serious than a misdemeanor. Mr. Farr knew that he could potentially spend the rest of his life in prison if convicted of [the charge]." CP at 269-70.

During the rational understanding of courtroom procedures portion, Dr. Henry found Farr's capacity to make decisions was only in the moderately impaired range and noted most individuals in this range are competent to stand trial. However, Farr exhibited paranoid delusions related to his perceptions of the possible outcomes of his case that

negatively impacted his perception of the legal proceedings, his legal decision making, and the possible outcomes of his case.

While Dr. Henry believed that Farr had an overall capacity for rational thinking in court-related proceedings, when combined with Dr. Henry's observations, he found Farr not competent and requested an order of 90 days of competency restoration. Dr. Henry diagnosed Farr with a psychotic disorder and a history of polysubstance dependence. Because of changes to chapter 10.77 RCW, Dr. Henry did not address the sanity question.

Based on this report, the trial court stayed proceedings for 90 days and committed Farr to ESH for competency restoration treatment.

*Second competency evaluation*

Dr. Henry reevaluated Farr and issued a report on March 5, 2013 finding him competent after restoration. Dr. Henry opined that Farr's personality traits were the primary issues contributing to his behavior and emotional instability. Dr. Henry also believed that Farr's psychotic symptoms were possibly linked with his substance abuse. Dr. Henry remarked on Farr's problematic behaviors at ESH during his stay though the severity had lessened in recent weeks, possibly due to his prescribed psychiatric medications. Before the interview, Dr. Henry observed a nurse give Farr an antipsychotic medication with significant sedating effects. Farr became increasingly heavy-eyed during the interview and slurred some of his words.

4

When Dr. Henry evaluated Farr on the same factors as discussed above, he believed that Farr would be able to adequately assist his attorney in his own defense. He based this on Farr's positive attitudes toward his attorney and an appropriate tendency to rely on his attorney's advice. Farr still had negative and antisocial attitudes toward the legal process, but Dr. Henry did not believe his attitudes were reflective of psychosis.

Dr. Henry also believed that Farr had a good understanding of courtroom proceedings. Farr was able to correctly identify the primary figures in the courtroom and their respective roles. Farr knew he was charged with assault in the first degree. Farr knew that his charges were felonies, knew that a felony is more serious than a misdemeanor, and knew that a defendant could spend time in jail or prison if convicted of these charges. "He described Assault as 'hurting somebody I guess'" and "knew that a jury determines the verdict in a jury trial." CP at 278.

On Farr's rational understanding of courtroom proceedings, Dr. Henry noted that Farr still made statements reflecting persecutory delusions that impacted his perception of whether he could get a fair trial. However, other statements appeared derivative of his "negative attitudes towards authority figures; emotional reactivity; and anxiety associated with [ ] trauma." CP at 278. Farr also "reflected [a] rational understanding of a plea bargain and reasonable factors a defendant might consider in deciding whether or not to accept an offer from the prosecuting attorney." CP at 278. Based on the above, Dr.

5

Henry believed that Farr had the "capacity to understand the proceedings against him and to participate in his own defense." CP at 279.

On April 8, 2013, having reviewed Dr. Henry's report, the trial court entered an order of competency. On the same day, Farr entered a plea of not guilty. He confirmed that the information of the charge had been read to him and that he had been provided with a copy of the information.

*Appointing the guardian ad litem*

Following the entry of Farr's plea of not guilty, his counsel filed a motion asking the trial court to appoint Mark Farr, Farr's father, as a guardian ad litem (GAL) pursuant to RCW 4.08.060. In the declaration accompanying the motion, Farr's counsel stated he had reviewed the charges with Farr, including the elements of each charge, and had read the discovery information to him. However, counsel was uncertain if Farr understood the magnitude of the charges even when the information was explained on a weekly basis. Counsel attributed this to Farr's heavy medication, part of his restoration treatment. Because counsel was concerned about Farr's ability to retain and understand information, he thought it best to appoint a GAL.

The trial court granted the motion and ordered the appointment of Mark Farr as a GAL. The trial court found that Farr "was determined to be incompetent to stand trial; that [his] competency has been restored through medication therapy; that [he] does not

6

appear to understand the ramifications of the crimes charged; and that [his] interests can be protected by a Guardian Ad Litem." CP at 253.

*Third competency evaluation*

On May 17, 2013, Farr's counsel moved for a sanity evaluation by Dr. Philip Barnard, a forensic psychologist, noting that ESH had declined to determine Farr's sanity when he committed the assault. The trial court granted the motion and ordered Dr. Barnard to evaluate Farr's competency and sanity.

Dr. Barnard made his report on June 11, 2013. During the interview, Farr reported his recurrent auditory hallucinations had lessened since taking antipsychotic medication. Dr. Barnard also agreed with ESH's prior assessment that Farr's delusions stemmed from his paranoid nature. When speaking with Farr about the night of the incident, Farr stated he drank a fifth of Black Velvet, blacked out, did not remember anything from that night, and strongly asserted he was not guilty of the charge. When Dr. Barnard asked if it was possible that he assaulted the woman but did not remember it, (and alluding to the video showing that Farr did indeed stab her), Farr became defensive and then confused.

During the competency assessment portion, Farr was able to articulate the charges against him. But Dr. Barnard believed that Farr was severely incapacitated in his knowledge of available legal defenses. He based this on the following answers:

No. 40388-2-III
*State v. Farr*

> [T]o the question "*How do you think you can best be defended against these charges?*" Mr. Farr replied "Forensic." To the question "*How can you explain your way out of these charges?*" Mr. Farr replied "It was not me." To the question "*What do you think your lawyer should concentrate on to best defend you?*" Mr. Farr replied "It was not me."

CP (No. 33327-2-III)[1] at 47.

Of particular importance to this appeal, Dr. Barnard noted that Farr "would be interested in a plea bargain if it meant that he could be sent to a mental hospital rather than to prison." CP (No. 33327-2-III) at 47. Dr. Barnard diagnosed Farr with a psychotic disorder, cognitive disorder, learning disorder, polysubstance abuse, mild mental retardation, and a personality disorder. Dr. Barnard's opinion was that Farr was legally insane at the time of the incident because his impaired reality, defects in judgment and reasoning, and mental defects "grossly impaired his ability to tell right from wrong and be aware of the nature and consequences of his actions." CP (No. 33327-2-III) at 48.

*Fourth competency evaluation*

On July 5, 2013, the State moved for an additional sanity and competency evaluation by ESH, which the court granted. However, after the trial court reviewed Dr.

---

[1] Reports of proceedings and clerk's papers for cause no. 33327-2-III have been transferred into the record for cause no. 40388-2-III. We will include that cause number in those citations to differentiate from the reports of proceedings and clerk's papers for cause no. 40388-2-III. Reports of proceedings and clerk's papers for cause no. 40389-1-III (the direct appeal) will also be differentiated.

8

Barnard's report a couple of days later, it found that Farr's competency needed to be restored and amended the order to include a 90-day restoration period.

On October 8, 2013, after Farr's second restoration period, Dr. Randall Strandquist, on behalf of ESH, evaluated Farr for the fourth time and submitted a report finding Farr had the capacity to assist his attorney and was sane during the incident. Of particular importance to this appeal, Dr. Strandquist, when reviewing Farr's time at ESH, highlighted a progress note that he believed showed Farr's "accurate understanding of court proceedings." CP (No. 40389-1-III) at 313. Farr was quoted as saying:

> "'I was found competent before and as soon as I'm found competent again my attorney will file the paperwork for NGRI. We paid $3000 for a private investigator/evaluator who said I'm competent but was crazy at the time I committed my crimes. The prosecutor will sign off and I'll do 10 years upstairs compared to 30 years in prison. I'll be safer here too, since I'm a gang member.'"

CP (No. 40389-1-III) at 313.

During the competency portion of the interview, Farr was able to explain the roles and responsibilities of the judge, defense attorney, prosecuting attorney, witnesses, and jury. He was able to identify his attorney and how to contact him. He knew and could explain the concept of a plea bargain and was aware of his plea options regarding the charges. Farr also knew that a sentencing follows a guilty plea and a trial follows a not guilty plea and could correctly identify the crimes for which he was charged.

9

No. 40388-2-III
*State v. Farr*

*The NGRI plea*

On November 1, 2013, Farr filed a motion for judgment acquitting him of assault by reason of insanity and a written NGRI plea signed by Farr and his counsel.  In his plea, Farr stated:

> It is my belief that at the time of committing this offense I was legally insane.
> It is further my belief that since being committed to State Hospital subsequent to being arrested on these charges, I am now competent to stand trial and to appreciate the quality of my acts although I am still suffering from Psychotic Disorder not otherwise specified and cognitive disorder, not otherwise specified.
> In making this plea I understand that if the court accepts my plea and my motion for acquittal by reason of insanity that I am admitting that I committed the acts charged in the information, and if the court finds that I was not responsible by reason of my mental condition I am waiving my constitutional right to a jury trial on that issue.  I also understand that I may not later contest the validity of my detention on the ground that I did not commit the acts charged.
> Furthermore, if the court accepts the motion, I waive my constitutional right to have a jury determine whether I am dangerous to others or likely to commit felonious acts jeopardizing public safety or security, and I give up the right to confront my accusers.  I understand that I may be subject to commitment as criminally insane for as long as the maximum penal sentence for the offenses charged, which is life.
> My attorney has explained to me, and we have fully discussed, the above consequences of this plea.  I understand the nature and consequences of this plea and have no questions of the court.

CP (No. 33327-2-III) at 8-9.

10

On the same day, the trial court held a hearing to determine whether to accept Farr's plea. Although Dr. Strandquist had recently found that Farr was sane at the time of the offense, the State stipulated to Dr. Barnard's differing opinion.

In support of the plea, Farr's counsel noted that each time Farr went to ESH he came back a little better and counsel believed that an NGRI plea was the best alternative for Farr. Farr's counsel confirmed that he discussed the plea with Farr a few days before. Mark Farr, in his capacity as GAL, also attended the discussion between his son and his attorney.

At the plea hearing, Mark Farr spoke to the court:

> The thing is that [my son] doesn't need prison. He doesn't do well in prison. He didn't get treated in prison. He doesn't need to be locked in a room 23 hours a day and isolated from everybody. My son needs treatment. And we believe this is the best—the best thing for him. Whether it takes seven, ten, twenty years, I don't care. I just want him to get better and have that chance. So I'm asking you to agree with this motion.

Report of Proceedings (RP) (No. 33327-2-III) (Nov. 1, 2013) at 5.

The trial court addressed Farr.

> THE COURT: . . . Mr. Ryan Farr, I have in front of me your plea of not guilty by reason of insanity. And I just want to go through a few items with you.
> Does that make sense?
> [MR. FARR]: Yeah.
> THE COURT: Okay. You are alleging that at the time of the offense, you were legally insane; correct?

11

[MR. FARR]: Yes.

THE COURT: And you are at this time competent to stand trial and that you appreciate the quality of the acts, even though you suffer from a psychotic disorder?

[MR. FARR]: Yes.

THE COURT: Do you understand that if the Court accepts this motion, you waive your right to have a jury determine whether you are dangerous to others or not?

[MR. FARR]: Yeah.

THE COURT: And that by entering this plea, you are waiving your constitutional right to a jury trial?

. . . .

[MR. FARR]: Yes.

THE COURT: And in addition, you give up the right to confront any accusers in this matter?

[MR. FARR]: Yeah.

THE COURT: And most importantly, you understand that you may be subject to commitment as criminally insane for as long as the maximum penalty sentence for the offense charged, which could be life; do you understand that?

[MR. FARR]: Yeah.

THE COURT: I believe that the Defendant is competent and understands the plea statement.

RP (No. 33327-2-III) (Nov. 1, 2013) at 5-6.

The court made the following findings of fact and conclusions of law:

1.	The Defendant committed the act alleged in Count 1 of the information;

2.	The defendant was legally insane at the time of the commission of the act alleged in the information and is not legally responsible for said acts;

3.	There is a substantial danger that the defendant may injure other persons or himself unless kept under further control by the court or other appropriate institutions;

12

4.	There is a substantial likelihood that the defendant may commit felonious acts jeopardizing the public safety or security unless kept under further control by the court or other appropriate institutions;

5.	It is in the best interests of the defendant and the public that the defendant, Ryan Lewis Farr be placed in treatment at the state mental hospital at Eastern State Hospital . . . .

. . . .

1.	That the court has jurisdiction over the parties and subject matter of this cause.

2.	That an order should be entered remanding the defendant to the jurisdiction of Eastern State Hospital for the appropriate treatment as being criminally insane, pursuant to RCW chapter 10.77.

CP (No. 40389-1-III) at 21-22.

The trial court also entered an order of commitment consistent with the findings and conclusions and committed Farr to ESH, subject to conditional release or final discharge.

*Postconviction proceedings*

Starting on October 7, 2014, Farr sent three letters to the trial court, each a few months apart. The letters asked the court to vacate his NGRI plea because Farr believed he was incompetent at the time of the hearing, could not remember the hearing, and there was a conflict between him and his counsel. On April 24, 2015, Farr filed a personal restraint petition. On April 30, 2015, Farr filed a notice of (direct) appeal, seeking review of the trial court's November 1, 2013 findings of fact and conclusions of law relating to his NGRI plea.

13

Soon after, this court ruled that the PRP was technically untimely but found it related back to Farr's first letter to the trial court, thus rendering it timely. The PRP matter was referred back to the trial court because no action had been taken by the trial court on his request to vacate his plea, and it remained "the role of that court to determine [the] appropriate disposition of the matter under CrR 7.8(c)." CP (No. 40389-1-III) at 334.

In June 2015, Farr filed in the trial court a CrR 7.8 motion to vacate his NGRI plea. At the appellate level, Farr asked this court to stay his direct appeal, pending the proceedings at the trial court level. We granted his request.

In March 2016, the trial court heard Farr's motion to vacate his NGRI plea. Farr's counsel called Dr. Barnard as an expert witness. Dr. Barnard testified he found Farr incompetent in June 2013 because Farr failed to understand courtroom procedure and charges and penalties, and because Farr's ability to cooperate with his lawyer was borderline marginal. In preparation for the hearing, Dr. Barnard had reexamined Farr to determine his competency and reviewed the ESH report finding Farr competent in 2013 after his second restoration. After the reexamination, Dr. Barnard believed Farr was now competent. However, although Dr. Barnard had not seen Farr between his second restoration in October 2013 and Farr's November 1, 2013 NGRI plea, Dr. Barnard

14

disagreed with ESH's October 2013 report finding Farr competent near the time of that plea.

The court recessed for the morning. When the court reconvened, Farr asked to speak directly with the court. Farr expressed dissatisfaction with his counsel's questioning of Dr. Barnard, wanted to retain a new attorney, and asked that the hearing be continued. The court responded:

> I am not appointing a new attorney. He is your appointed counsel and he [will] continue.
> Having said that, if you are wanting to continue this hearing for whatever reason and schedule it down the road, that's up to you.
> [MR. FARR]: I would like to do that.
> THE COURT: Okay. The matter can be renoted at some point in the future, but [your attorney] continues to be your counsel.

RP (No. 33327-2-III) (Mar. 3, 2016) at 27-28.

At the appellate level, several stays were granted until late December 2016, when the court noted, "Given Mr. Farr has elected to not pursue any action in the trial court, the stay is hereby lifted." Br. of Resp't, App. B.

On March 14, 2017, Farr's appellate counsel filed a motion to withdraw and to dismiss the appeal as not ripe for review. His motion stated in relevant part:

> To date no notice of appearance has been filed and nothing further has transpired in the superior court . . . .
> . . . [T]he matter is not ripe for review . . . because the superior court has yet to issue a ruling on [Mr. Farr]'s motion to withdraw his NGI plea, which is the sole issue in this appeal. [Mr. Farr] will not be denied a

remedy, should this Court grant the motion to dismiss this appeal because he would still have the option of filing another notice of appeal after the superior court renders its decision.

Br. of Resp't, App. C at 2-3.

Farr's appellate counsel did not accompany the motion with Farr's written consent to dismiss the appeal, but a copy of the motion was mailed to him on March 27, 2017. On April 11, 2017, this court granted the motion and dismissed Farr's direct appeal.

Over the next several years, Farr had multiple review hearings to determine the appropriateness for being conditionally released from ESH. In December 2022, ESH granted him conditional release. While on release, Farr violated his conditional release terms by not attending treatment programs, refusing to provide urine samples, not following house rules at his assisted living facility, and consuming nonprescribed controlled substances, including methamphetamine. In October 2023, the trial court revoked his conditional release and ordered him returned to ESH. The trial court concluded revocation of conditional release was appropriate because Farr continued to be a threat to public safety given Farr's index offense of assault in the first degree was committed while under the influence of illegal controlled substances.

In November 2023, Farr filed a renewed CrR 7.8 motion in the trial court to vacate his NGRI plea. On April 18, 2024, the motion came before the trial court again. Farr asserted he was not told the essential elements of the offense, he was not told that he had

16

the right to remain silent, and he was not told of possible sentencing alternatives. He also

renewed his argument that he was not competent at the plea hearing. After hearing

arguments, the court denied Farr's motion to vacate his NGRI plea. The court found that

Farr's "plea was knowingly, intelligently and voluntarily made" based on

> reports from both [ESH] and from [Mr. Farr]'s expert considered at
> the time of the plea, [Mr. Farr]'s motion and the stipulation which he had
> signed certifying to his complete understanding of all aspects of his plea
> . . ., his counsel's indication that he felt [Mr. Farr] was competent and fully
> understood the plea, the lack of any evidence that Mr. Farr did not
> understand the consequences of his plea, and the fact that his responses to
> the court at the plea hearing were coherent.

CP at 236-37.

On April 22, 2024, Farr appealed the denial of his CrR 7.8 motion. On the same

day, he filed a second notice of direct appeal of his November 1, 2013, order of

commitment and the findings and conclusions related to his NGRI plea.

*Proceedings before this court*

In June 2024, Farr filed a motion to enlarge time and argued why his second

appeal should be considered timely. The State did not respond to Farr's motion. In

granting Farr's motion to enlarge time, a commissioner of this court noted:

> The State has not responded to either the Court's motion to dismiss this
> matter as untimely or Mr. Farr's motion to enlarge the time for filing his
> notice of appeal. Thus, the State has failed to demonstrate that Mr. Farr
> waived his right to appeal, and Mr. Farr's criminal appeal may not be
> dismissed as untimely.

Comm'r's Ruling, No. 40388-2-III (Wash. Ct. App. July 11, 2024) at 3. The State did not file a motion to modify the commissioner's ruling.

ANALYSIS

Before we address Farr's arguments, we must first address the State's argument why this second direct appeal should be dismissed. It argues, "The present appeal should be dismissed because Farr has already been granted one belated direct appeal, which he dismissed five years ago." Resp't's Br. at 25 (capitalization and bold omitted). And "[b]ecause Farr was already granted one appeal, he clearly was aware of his right to appeal, and fails to show justification for another one." Resp't's Br. at 27.

Farr's response is somewhat confusing. His first several arguments misconstrue the State as arguing that Farr waived his right to *file* an appeal. That is not what the State is arguing. The State is arguing that Farr filed an untimely first appeal; therefore, he knew of his right to appeal, and he later waived his right of direct review when he dismissed that appeal. Farr's last two arguments are responsive to the State's argument. We address them after first setting forth the relevant legal principles and a short restatement of the controlling facts.

The State bears the burden of demonstrating that the defendant "understood his right to appeal and chose not to exercise it." *State v. Kells*, 134 Wn.2d 309, 315, 949 P.2d 818 (1998); *see also State v. Sweet*, 90 Wn.2d 282, 287, 581 P.2d 579 (1978). The

circumstances must reasonably give rise to an inference that the defendant knowingly, intelligently, and voluntarily relinquished this right. *Sweet*, 90 Wn.2d at 287.

Here, Farr filed his first notice of direct appeal on April 30, 2015, 18 months after the trial court accepted his NGRI plea. We permitted that untimely appeal and stayed it pending the trial court's resolution of his CrR 7.8 motion. On December 23, 2016, we lifted the stay, inferring that Farr had elected not to pursue his CrR 7.8 motion. Three months later, Farr, through appellate counsel, moved to dismiss his direct appeal. In the motion, appellate counsel explained that the direct appeal was not ripe because the trial court had yet to rule on Farr's CrR 7.8 motion and stated that Farr could appeal from an adverse ruling on that motion. We granted Farr's motion and dismissed his first direct appeal. In April 2024, Farr in fact did appeal the trial court's denial of his CrR 7.8 motion, and that appeal is properly before this court.

*The withdrawal of Farr's first direct appeal was not unlawful*

Citing RAP 18.2, Farr argues the withdrawal of his first direct appeal was "unlawful" because appellate counsel failed to obtain his written consent to dismiss his appeal. Reply Br. at 12. We disagree.

RAP 18.2 reads in relevant part: "The appellate court on motion may, in its discretion, dismiss review of a case on stipulation of all parties and, in criminal cases, the written consent of the defendant, if the motion is made before oral argument on the

merits." Farr's 2017 motion to dismiss his first direct appeal was not by stipulation nor did it include Farr's written consent. But this does not render the withdrawal of his first direct appeal "unlawful."

An appellate court may waive compliance with its rules to serve the ends of justice. RAP 1.2(c). Although we could have denied Farr's motion for failing to strictly comply with the rule, the record establishes that the purposes of the rule were honored.

For instance, the State did not object to Farr's motion to dismiss.[2] Also, a proof of service signed by appellate counsel and filed in this court certified that on March 27, 2017, he mailed Farr a copy of the March 14, 2017 motion to dismiss in care of ESH. Two weeks later, we granted Farr's motion to dismiss his direct appeal.

*Circumstances give rise to the reasonable inference that Farr approved the motion to dismiss his first direct appeal*

Next, Farr argues there is no evidence he consented to the dismissal of his first direct appeal. This argument goes to the important question of whether there are circumstances that reasonably give rise to an inference that Farr knowingly, intelligently, and voluntarily relinquished his right to appeal. *See Sweet*, 90 Wn.2d at 287.

---

[2] Our internal records reflect an e-mail exchange between a commissioner's legal assistant and Teresa Chen, the State's attorney, confirming the State had no objection to Farr's motion to dismiss.

In general, insofar as an attorney is the representative and alter ego of their client, we presume that the attorney acts with their client's approval. *City of Vancouver v. Boldt*, 21 Wn. App. 2d 100, 107-08, 504 P.3d 862 (2022). However, the dismissal of an appeal touches on the constitutional right to appeal, so we will not make this presumption. We, nevertheless, may and do consider his attorney's act of requesting dismissal of the appeal as evidence that client consent was given.

Also, Farr actively participated in his own legal matters. He personally sent three letters to the trial judge asking to withdraw his NGRI plea. He sought and obtained assistance for the late filings of his Cr 7.8 motion and his first direct appeal. At the CrR 7.8 hearing, he was unhappy with how his appointed counsel was examining his expert witness and asked the trial court to appoint new counsel. Farr's active participation in his own legal matters is evidence that had he not consented to the dismissal of his first appeal, he would have sent letters to this court, as he did on three earlier occasions.

Importantly, by dismissing his first direct appeal, Farr was not waiving his right to challenge his NGRI plea. At the time, his challenge was pending in the trial court, and, if he lost that challenge, he still could appeal. This lends additional support to the notion that Farr consented to the dismissal of his first direct appeal.

Because there is a reasonable inference that Farr knowingly, intelligently, and voluntarily consented to the dismissal of his first appeal, we conclude he waived his right to continue that appeal.[3] Also, this is Farr's second direct appeal. He conceded this in his motion to enlarge time after filing this appeal. There is no constitutional or statutory right to a second direct appeal. For these reasons, we dismiss this appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Cooney, J.                                    Murphy, J.

---

[3] Even were we to conclude otherwise, the procedure for remedying an attorney's unauthorized dismissal of an appeal is to file a motion to withdraw the mandate. *See State v. Wallahee*, 3 Wn.3d 179, 187, 548 P.3d 200 (2024). It is not to file a second appeal seven years later.